Peelle, J.,
delivered the opinion of the court:
This case is prosecuted under the Indian Depredation Act March'3,1891 (26Stat.L., Sol, 1 Supp. Lev. Stats.,2d ed.,p.913), to reco verjthe value of certain property alleged to have been taken by Indians belonging to the Sioux tribe June 30, 1866. This is the first, in the order of time, of six depredations alleged to havebeen committed on the property of the claimant by Indians from June 30,1866, to August 1,1867; and while the facts as to the amity of the Indians charged at the time of the several depredations differ, the questions otherwise presented, as to five of the depredations, are the same, and we will consider them in this case.
The claim for the property taken in the case at bar was not presented to the Commissioner of Indian Affairs until March 8, 1873. It was first examined and allowed under the Act May 29,1872 (17 Stat. L., 190), and afterwards, as thus “allowed,” *296 was, under tbe Act March 3,1885 (23 Stat. L., 376), reported to Congress as barred, becausenot filed within three years, as provided by section 17, Act 1834 (4 Stat. L., 731). Subsequent to the Act May 15,1886 (24 Stat. L., 44), however, the claim was again examined and allowed under the provisions of the Act 1885 (supra), and was reported to Congress on the 5th day of January, 1888. (House Ex. Doc.No. 34, Fiftieth Congress, first session.)
After the claim was presented to this court by petition, as required, the claimant, under the last paragraph of section 4, act 1891 (supra), elected to “reopen the case and try the same before the court,” and sought to confine such reopened case to the question of the amount of damages alone, conceding for that purpose that the award or allowance by the Secretary of the Interior was in all other respects correct. The claim having been examined under the Act of March 3, 1885 (supra), and subsequent Indian appropriation acts', by or under the direction of the Secretary of the Interior, and approved and allowed, as set forth in the findings, set asideaud superseded the former allowance made under the Act of 1872 (supra), and by the provisions of section 4, Act 1891 (supra), the claim, as “last examined, approved, and allowed,” was entitled to priority of consideration and judgment had not the claimant or the United States elected to “ reopen the case and try the same before the court.”
The first question presented, therefore, is as to the effect of such reopening, and as to this we think there is no room for two opinions. The language of section 4 (supra) on this subject is as follows:
“ Provided, That all unpaid claims which have heretofore been examined, approved, and allowed by the Secretary of the Interior, or under his direction, in pursuance of the act.of Congress making appropriations for the current and contingent expenses of the Indian department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and subsequent Indian appropriation acts, shall have priority. of consideration by such court, and judgments for the amounts therein found due shall be rendered, unless either the claimant or the United States shall elect to reopen the case and try the same before the court, in which event the testimony in the case given by the witnesses and the documentary *297 evidence, including reports of Department agents therein, may be read as depositions and proofs: “ Provided, That tbe party electing to reopen tbe case shall assume tbe burden of proof.”
That language is plain, and needs no interpretation. “ Elect to reopen tbe case and try tbe same before tbe court” is a right conferred by tbe act, and no cause need be assigned to entitle either party to exercise such election. Tbe claimant under that clause of tbe act did “ elect to reopen tbe case and try tbe same before tbe court.” Tbe law in effect left it optional with tbe claimant to say whether or not be would elect to take a new trial, and having exercised bis election be can not restrict tbe trial to such parts of tbe cáse as may be favorable to him and thereby shut out all other matters of defense. Tbe language of tbe act quoted can not, by any known rule of interpretation, be construed to mean a partial trial, nor can tbe language be construed to mean an investigation or trial simply as to the amount of tbe damages sustained. That such claims might be adjudicated in tbe manner provided in the act section 4 provides:
“ It shall be the duty of tbe Attorney-General of tbe United States to appear and defend tbe interests of tbe Government and of tbe Indians in tbe.suit, and within sixty days after tbe service of tbe petition upon him, unless tbe time stated be extended by order of tbe court made in tbe case, to file a plea, answer, or demurrer on tbe part of tbe Government and tbe Indians, and to file a notice of- any counterclaim, set-off, claim of damages, demand, or defense whatsoever of tbe Government or of thé Indians in tbe premises.”
If, therefore, tbe claimant or tbe United States elects to reopen a case, all matters of defense contemplated by said section will be held applicable to such allowed cases. This is essential to enable tbe court-to “inquire into and finally adjudicate” the claim. ’
If tbe contention of tbe claimant should prevail, tbe Government would be denied tbe right of raising a question of law by way of demurrer or otherwise, and tbe court would thereby be restricted in its inquiry and final adjudication to an investigation of tbe amount of damages sustained, without reference to the jurisdictional requirements of tbe act or to matters of defense arising in law. In other words, tbe action of tbe Secretary of tbe Interior would not only be tbe test of jurisdiction, but bis action would be conclusive on tbe court in all *298 matters of law pertaining thereto; that this was not the intention of Congress by the act of 1891, where a c?"e is reopened, we deem it unnecessary to discuss.
The court is of the opinion, and so hold the law to be, that when a case has been reop ened by either the claimant or the United States the whole case stands before the court for trial de novo, subject only to the provision concerning the burden of proof, as set forth in section 4- (supra).
As to the other questions presented, we understand the theory of the'claimant’s counsel tobe, (1) that, this case having been examined and allowed by the Secretary of the Interior by authority of the act of 1885, etc., it was, under section 4, Act 1891 (supra), if not reopened as therein provided, entitled to priority of consideration and judgment, in which condition he contends that neither the amity nor the treaty relations of the Indians were jurisdictional; and therefore, if reopened, the case is not thereby divested of its privileged character of trial and judgment without reference to those questions; (2) that the defendant Indians, being in treaty relations, amity is not jurisdictional, and (3) that the defendant Indians were in fact in amity with the United States at the time of the depredation complained of. While, on the other hand, the defendants contend, (1) that the defendant Indians were not in treaty relations with the United States at the time of the depredation; (2) that if jurisdiction is acquired by reason of the allowance of the claim by the Secretary of the Interior, then the amity of the Indians is a test of liability as to the United States, and (3) that the defendant Indians were not in fact in amity with the United States when the depredation was committed.
The claimant’s first and second propositions assume that jurisdiction is conferred on the court by the act of 1891 to “inquire into and finally adjudicate” what are termed “allowed” claims and “treaty” claims, referred to in the second subdivision of section 1 of tbe act, as separate and distinct from the jurisdiction acquired over the claims embraced in the first subdivision; for, as to the latter class, the claimant concedes that amity is jurisdictional.
That we may be aided in our endeavor to ascertain the intention of pongress, as expressed in the Aot March 3,1891 (supra), concerning the court’s jurisdiction thereunder, we will consider *299 briefly the policy of the United States in dealing with, tbe Indians, both by treaty and by legislation, on the subject of the taking and destruction of property by Indians, and to do so we will consider, * * *
“(1; Wliat was the law before the act was passed; (2) what was the mischief or defect for which the law had not provided; (3) what remedy the Legislature has appointed, and (4) the reason of the remedy.” * * * (Sec. 27, Endlich on Interpretation of Statutes.)
An extensive résumé of the treaties and statutes relating to the Indian tribes previous to and during the old Confederation will be found in the separate (concurring) opinion of Justice Baldwin in the case of the Cherokee Nation v. Georgia. (5 Pet., 32.)
Soon after the adoption of our Constitution the Government continued the policy of negotiating treaties with the Indian tribes. Appropriations were made for that purpose from time to time, beginning August 20,1789 (1 Stat. L., 54), thus recognizing the Indians in their tribal relations (Kansas Indians, 5 Wall., 737.) And when that relation has been recognized by the political departments of the Government the courts are bound by it (United States v. Holliday, 3 Wall., 407). Up to 1796, however, treaties had been negotiated with comparatively few tribes, and in one only, that with the Oheroltees, of January 21, 1795 (Art. 4, Eevision of Indian Treaties, p. 32), had any provision been made for the payment of claims out of annuities for property taken or destroyed by Indians, and in this treaty the taking was limited to horses and the value fixed.
Under the constitutional grant of power “to regulate commerce with * * * the Indian tribes ” Congress, on the 22d July, 1789, enacted the first law to regulate trade and intercourse with the Indian tribes (1 Stat. L., 137), and by section 5 of that act it was provided “that if any citizen or inhabitant of the United States * * * shall go into any town, settlement, or territory belonging to any nation or tribe of Indians, and shall there commit any crime upon or trespass against the person or property of any peaceable and friendly Indian or Indians, etc.,” such offender was to be proceeded against as therein provided. This act expired by its own terms in two years, and on March 1, Í793 (1 Stat L,, 329), was reenacted *300 with some additions, and expired by its own terms in two years.
These acts are on]y important now as showing the early policy of the Government in protecting peaceable and friendly Indians against wrongs committed by citizens or inhabitants of the United States and the inducements thereby offered to live at peace.
The last act referred to was enlarged upon and reenacted May 19, 1790 (1 Stat. L., 469), and section 4 of said act is an enlargement of previous sections on the same subject; for, in addition to punishment for crimes as there stated, it is provided in substance that if such citizen or inhabitant should, unauthorized by law and with a hostile intention, be found on any Indian land he should forfeit $100, besides being imprisoned for twelve months; and if property be taken, he shall pay twice the just value of the same; and if unable to pay at least the .just value, the Government was to pay the same. That section was subsequently reenacted, and is now Be vised Statutes, sections 2154 and 2155. Here it will be observed the policy of the Government was not only to protect peaceable and friendly índians against the wrongs of white men, but to compensate them when their property was taken; while, on the other hand, concerning depredations by Indians, the Act of 1796 (supra), section 14, provides—
“And be it further enacted, That if any Indian or Indians, belonging to any tribe in amity with the United States, shall come .over or across the said boundary line into any State or Territory inhabited by citizens of the United States, and there take, steal, or destroy any horse, horses, or other property belonging to any citizen or inhabitant of the United States, or of either of the territorial districts of the United States, or shall commit any murder, violence, or outrage upon any such citizen or inhabitant, it shall be the duty of such citizen or inhabitant, his representative, attorney, or agent, to make application to the superintendent, or such other person as the President of the United shall authorize for that purpose, who, upon being furnished with the necessary documents and proofs, shall, under the direction or instruction of the President of the United States, make application to the nation or tribe to which such Indian or Indians shall belong for satisfaction; and if such nation or tribe shall neglect or refuse to make satisfaction, in a reasonable time, hot exceeding eighteen months, then it shall be the duty of such superintendent, or other persons *301 authorized as aforesaid, to make return of bis doings to tlie President of the United States, and forward to him all the documents and proofs in the case, that such further steps may be taken as shall be projier to obtain satisfaction for the injury; and in the meantime, in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party injured an eventual indemnification: Provided always, That if such injured party, his representative, attorney, or agent, shall, in any way, violate any of the provisions of this act by seeking or attempting to obtain private satisfaction or revenge, by crossing over the line on any of the.Indian lands, he shallTor-feit all claim upon the United States for such indemnification: And provided, also, That nothing herein contained shall prevent any legal apprehension or arresting, within the limits of any State or District, of any Indian having so offended: And provided further, That it shall be lawful for the President of the United States to deduct such sum or sums as shall be paid for the property taken, stolen, or destroyed by any such Indian out of the annual stipend which the United States are bound to pay to the tribe to which such Indian shall belong.”
This was the first law on the subject of Indian depredation claims, and under it the amity of the tribe to which the depre-dating Indians belonged was an essential prerequisite to indemnity.
The use of the words u any tribe in amity with the United States” was a recognition by Congress not only of the tribal relation, but in effect of the belligerent rights of such tribe.
At that time, as before stated, there were comparatively few tribes in treaty relations, and there being nothing in the section indicating a different intent, and the language of the act, “ if any Indian or Indians belonging to any tribe in amity with the United States,” being broad and comprehensive, we think the purpose of the act was to embrace all claims of citizens or inhabitants for depredations committed by Indians, whether such Indians were in treaty relations or not.
This act expired by its own terms in two years, and was reenacted March 3,1799 (1 Stat. L., 747), and that act expiring by its own terms in three years was reenacted March 30, 1802 (2 Stat. L., 139). Acts supplemental to this latter act were passed from time to time (see footnote, 2 Stat. L., p. 140), but section 14 of the Act of 1796 (supra) remained the same, and became section 14 in the act of 1802, which latter continued in force until superseded by the Act of June 30,1834 *302 (4 Stat. L., 731), when tbe last general law on tbe subject of Indian depredation claims was passed and section 17 of tbis act is as follows:
“And be it further enacted, That if any Indian or Indians belonging to any tribe in amity witb tbe United States shall, witbin tbe Indian country, take or destroy tbe property of any person lawfully witbin such country, or shall pass from tbe Indian country into any State or Territory inhabited by citizens of tbe United States, and there take, steal, or destroy any horse, horses, or other property belonging to any citizen or inhabitant of tbe United States, such citizen or inhabitant, bis representative, attorney, or agent, may make application to tbe proijer superintendent, agent, or subagent, who, upon being furnished witb tbe necessary documents and proofs, shall, under the direction of tbe President, make application to tbe nation or tribe to which said Indian or Indians shall belong for satisfaction; and if such nation or tribe shall'neglect or refuse to make satisfaction in areasonable time, not exceeding twelvemonths, it shall be the duty of such superintendent, agent, or subagent to make return of his doings to the Commissioner of Indian Affairs, that such further steps may be taken as shall be proper, in the opinion of the President,,to’obtain satisfaction for the injury; and in the meantime, in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party so injured an eventual indemnification: Provided, That if such injured party, his representative, attorney, or agent, shall in any way violate any of the provisions of this act by seeking or attempting to obtain private satisfaction or revenge, he shall forfeit all claim upon the United States for such indemnification : And provided also, That unless such claim shall be presented within three years after the commission of the injury the same shall be barred. And if the nation or tribe to which such Indian may belong receive an annuity from the United States such claim shall, at the next payment of the annuity, be deducted therefrom and paid to the party injured; and if no annuity is payable to such nation or tribe, then the amount of the claim shall be paid from the Treasury of the United States: Provided, That nothing herein contained shall prevent the legal apprehension and punishment of any Indians having so offended.” (4 Stat. L., 731.)
Section 18 of this same act empowered the superintendents, agents, and subagents, within their respective districts, to administer oaths and take depositions as to depredations committed by both Indians and whites under sections 16 and 17 of the act.
Through all these statutes we find the word amity; that is, *303 to entitle tbe claimant to compensation for tlie loss or destine tion of property by Indians it was necessary to show that the tribe to which snch depredating Indians belonged was in amity with the United States, and such is the plain reading of the statute without reference to the treaty relations of the Indians. That this act was intended to embrace claims against Indians not under treaty relations as well as those under treaty relations is clear; for, in addition to the guaranty of eventual indemnification by theUnited States, it is provided that “if no annuity is. payable to such nation or tribe, then the amount of the claim shall be paid from the Treasury of the United States.”
The word amity is as old as the books, and, in the absence of any express declaration by Congress to the contrary, interprets itself, and the court is bound, therefore, to hold that amity means not treaty relations, but a condition of peace and friendship, as defined in the Maries Case (28 C. Cls. E., 147)*
To construe the word amity to mean treaty relations might in effect be to say peace reigned, when in fact war was flagrant. Such a construction would not be warranted in the face of the universal rule against the payment of losses occurring in war— a doctrine to which the United States have by express statute time and again adhered, even as against the losses of tlieir own citizens, loyal as well as disloyal. (Valles Case, 2 ante p. 62.)
Section 14 of the act of 1796 as well as section 17 of the Act of 1834 (supra) contained originally a provision by which the United States guaranteed to the party injured “eventual indemnification,” and such guaranty continued until repealed by the Act of February 28,1859 (11 Stat. L., 401), not, however, impairing “ the obligation of-the Indians to make indemnification out of the annuities as prescribed in said act.” It will be observed that by this repealingact Congress in effect construed j the act of 1834 in so far as the taking or destruction of prop-] erty was concerned as “Indians trespassing on white men,” and the same was repeated in the Joint Resolution of June H5,1 1860 (12 Stat. L., 120). Congress has therefore in effect con- j strued an Indian depredation, or the taking or destruction of Í property by Indians, to mean “ Indians trespassing on white t men.”
It could not be contended by authority or with reason that *304 Congress by the Act 1834 (supra) intended to obligate tlie United States, as guarantor or otherwise, to pay for the loss or destruction of property by Indians engaged in war. But, aside from the liability of the United States, there is nothing in the act indicating an intention on the part of Congress to compel the Indians to pay for losses occurring in war, nor is there any provision in the treaty with the defendant Indians providing for the payment of such losses.
The language “Indians trespassing on white men,” used in the repealing Act 1859 (supra) and the Joint Resolution 1860 (supra) supports this view.
Congress no doubt has the authority to govern the Indians by statute instead of by treaty, as was held in United States v. Kcujama (118 U. S. R., 375), but, having recognized them in their tribal relations until the act March 3, 1871 (now Revised Statutes, section'2079), and by that act declared that “no obligation of any treaty lawfully made and ratified with any Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired,” they are entitled, at least until otherwise provided by law, to the rights and privileges of belligerents, and the use of the word “ amity ” is in effect a recognition of such rights.
It has been thd policy of the United States to sacredly adhere to their treaty obligations with the Indian tribes, and to protect by legislation such tribes from the misapplication of'their funds arising out of treaty stipulations.
Revised Statutes, 2097, provides:
“No funds belonging to any Indian tribe with which treaty relations exist shall be applied in any manner not authorized by such treaty or by express provisions of law; nor shall money appropriated to execute a treaty be transferred or applied to any other purpose unless expressly authorized bylaw.”
By Revised Statutes, section 2098, there is an express provision that depredation claims shall not be paid out of appropriations to pay annuities, and, further, that “ no claims for Indian depredations shall be paid until Congress shall make special appropriation therefor.” These provisions show the policy of the United States in dealing with the Indians who are under treaty relations, and who will doubt that such fidelity to treaty obligations, by positive enactments, has contributed to the protection of life and property.
From the organization of our Government to the Act March *305 3,1871 (supra), when tbe policy of treating witb tbe Indians as. independent nations ceased, there were negotiated about nine hundred treaties with about three hundred and fifty different tribes, subtribes, or bands of Indians (and we are advised there are still a few tribes not under treaty relations), and of that number of treaties only about forty contain any provision in any way, in expressed terms, for the payment, out of annuities or otherwise, of claims arising from depredations. (See appendix to this opinion, taken from House Beport No. 3117, Forty-ninth Congress, first session). But a provision in a treaty providing in express terms for the payment of depredation claims can not be construed to cover claims arising by acts of war in the absence of some express provisions of law or treaty.
It was said by Justice Washington, in a concurring opinion, in the case of Worcester v. Georgia (6 Pet., 5S2): “The language used in treaties with the Indians should never be construed to their prejudice.” The United States being tbe superior power, and having sought such treaties, they should not be so construed as to deprive the Indians of belligerent rights. Losses occurring in war must be suffered by him upon whom the loss falls. Such are the misfortunes of war, ,&nd unless the political departments of the Government see fit in the exercise of their power to enforce payment of such losses by way of indemnity or otherwise, the citizen is without a remedy except by petition to Congress.
The last proviso to paragraph 4, Bevised Statutes, section 1059, provides “that the jurisdiction of the Court of Claims shall not extend to any claim against the United States growing out of the destruction of or the appropriation or damage to property by the Army or Navy engaged in the suppression of the rebellion.” By the Act March 3, 1883 (22 Stat. L., 485, see. 3), this court is also inhibited from taking jurisdiction of claims “ growing out of the destruction or damage to property by the Army or Navy during the war for the suppression of the rebellion,” and that inhibition applies to loyal as well as disloyal citizens who may have suffered such loss. The same inhibition is contained in the Act March 3, 1887 (24 Stat. L., 505, sec. 1), wherein it is provided “ that nothing in this section shall be construed as giving to either of the courts herein *306 mentioned jurisdiction to bear and determine claims growing out of tbe late civil war and commonly known as war claims.” So, aside from tbe lack of obligation to pay war claims arising from international law and tbe laws of war, tbe United Suites bave by express statute set tbeir face against tbe payment of sncb claims against tbe United States.
Tbe Government, therefore, having by express statutes denied to its loyal citizens payment for tbe loss or destruction of x>roperty occurring in tbe war of tbe rebellion, can not be held liable, as guarantor or otherwise, in tbe absence of some express provision of law, to pay losses occurring in Indian wars ; and certainly tbe United States would not apply a different rule to a “domestic dependent nation,” with whom they were in treaty relations, without tbe consent of such tribe or nation. Tbe long-established and statutory recognition of tbe policy of tbe United States against tbe payment of claims arising by acts of war could only be disregarded by tbe lawmaking xiower.
Tbe claim in every case, under tbe act of 1834, arose from tbe taking or destruction of tbe property of a citizen or an inhabitant of tbe United States by Indians belonging to some tribe in amity with tbe United States, and no rights, other than tbe mere right of having claims investigated, bave been given to claimants except under and by virtue of that general act, unless other rights accrued by reason of treaty obligations; and in this connection it is averred in tbe petition in this case “that said Indians were chargeable for said depredation by reason of a treaty between such tribe and tbe United .States.” But, when we examine tbe treaty, we fail to find any provision, express or otherwise, for tbe |>ayment. of depredation claims. True, article 1 of tbe treaty relied uxion (14 Stat. L., .747), obligates tbe Indiaus “not only to cease all hostilities against the x>ersons and property of its citizens, but to use tbeir influence, and if necessary physical force, to prevent other bands of tbe Dakota Indians or other adjacent tribes from making hostile demonstrations against tbe Government or people of tbe United States.”
But that is an obligation to tbe United States to cease all hostilities, not to refrain from committing depredations, nor for tbe payment of depredation claims; so, if violated, it could only be by hostile acts, such as would necessarily show a want *307 of amity with the United States, if not war; besides, any and all questions which may arise by reason of the violation of such or similar obligations in a treaty would be- for the political departments of the Government to deal with; or, where “ the terms of the stipulation import a contract, when either of the parties engage to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract before it can become a rule for the court.” (Foster v. Neilson, 2 Pet., 253, 314.)
“A treaty is primarily a compact between independent nations,” and our Constitution declares u this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be madeunder authority of the United States, shall be the supreme law of the land.” And no distinction is there made between a treaty with a foreign nation and with an Indian tribe. A treaty with an Indian tribe, therefore, is “ a law of the land, as an act of Congress is,” and where such treaty prescribes a rule by which private rights can be determined, the court will resort to such rule; otherwise the court must look to the legislation of Congress for the enforcement of its provisions. (Secul Money Gases, 112 U. S., 580, 598.) *
Hostile acts, or even war, may be provoked by the United States, in which event treaty obligations would - be broken at the option of the Indian tribe, unless prevented by force.
The United States may exact an indemnity from such tribes as a condition of peace or for property destroyed in war, notwithstanding such tribe may have been provoked to war, and by superior power enforce its payment, but Congress has never conferred jurisdiction on the courts-to inquire into and enforce the payment of an indemnity for such loss or destruction or for the violation of such treaty obligations at the behest of one of their citizens.
In the treaty with the Rogue River Indian ■ tribe, April 7, 1855, it was provided, in substance, by the fourth article, that in consideration of the cession and relinquishment contained in article 1 the United States agreed to pay them the sum of $60,000, $15,000 of which sum was to be retained by the United States and applied to the payment of claims of whites for property destroyed by such Indians in the then. “ late war.” The treaty provided the method of ascertaining the extent of *308 sucb liability, but tbe amount to be- paid was fixed in tbe treaty, and sucb we understand bas been tbe policy of tbe United States in dealing with tbe Indians; tbat is, whenever they bave, m consideration of tbe provisions of any treaty, agreed to pay claims against tbe Indians originating in war or required tbe Indians to pay sucb claims, tbe amount so to be paid bas been agreed upon and fixed in sucb treaty. But we are aware of no treaty wbicb provides for tbe pajunent of claims wbicb may arise in future wars. If there are, and s.ucb claims should come before tbe court, it will be time enough to pass upon tbat question.
Tbe repeal of tbe “eventual indemnification” clause contained in section 17, act of 1834, by tbe Act of February 28, 1859 (supra), and tbe Act of July 5,1870 (supra), prohibiting tbe payment of depredation claims out of annuities, and providing tbat thereafter no depredation claim shall be paid except by specific appropriation, left section 17, as found in Revised Statutes, section 2156, except as to tbe limitation clause of three years in tbe original section, wbicb is for some reason omitted in tbe revision; but tbe claim in this particular case was filed, as shown by tbe findings, before tbe revision, while section 18, act 1834, is now Revised Statutes, 2157.
Up to 1870 (Act July 15, Rev. Stat., 2098) tbe claims of citizens or inhabitants of tbe United States for tbe loss or destruction of property by “ Indians belonging to any tribe in amity with tbe United States,” under tbe Act of 1834 (supra), were in tbe main, if not altogether, paid by deducting tbe value of tbe property found from annuities due tbe respective tribes, without any specific appropriation having been made therefor, though there were some acts passed prior to tbat time for tbe payment of sucb claims out of tbe Treasury of tbe United States.
By tbe Act May 29, 1872, section 7 (17 Stat. L., 190), it is provided : *309 at each session thereof, the nature, character, and amount' of such claims, whether allowed by him of not, and the evidence upon which his action was based: Provided, That no payment on account of said claim shall be made without a specific appropriation therefor by Congress.”
*308 “ Tbat it shall be tbe duty of tbe Secretary of tbe Interior to prepare and cause to be published sucb rules and regulations as be may deem necessary or proper, prescribing tbe manner of presenting- claims arising under existing laws or treaty stipulations, for compensation for. depredations committed by tbe Indians, and tbe degree and character of the evidence necessary to support such claims; be shall carefully investigate all sucb claims as may be presented; subject to tbe rules and regulations prepared by him, and report to Congress,
*309 That provision is now Bevised Statutes, sections 445, and 466.
Here for the first time the words atreaty stipulations” appear, but no right to compensation was given by the act. The mere right of having claims investigated was given, under such rules and regulations as the Secretary of the Interior should prescribe. His action was not to be conclusive, but advisory merely, as he was to report to Congress “the nature, character, and amount of such claims, whether allowed by him or not, and the evidence upon which his action was based.” A report, therefore, showing “the nature and character” of the claims, accompanied with such evidence, would enable Congress to determine whether or not such claim came within the provisions of existing laws, If the words “treaty stipulations ” had been omitted from the act, the claimant’s right to indemnity would have remained the same, as such rights were acquired under the act of 1834, and it would have been the duty of the Secretary to have examined the claim and reported the same to Congress.
The act was a recognition of existing claims and liabilities against the Indians, and that such liability might be ascertained, with a view of ultimate payment, the act was passed. There was no limitation in the act as to the class of persons whose claims should be examined, so to ascertain that the Secretary of the Interior had to go to the act of 1834, hence the act of 1872 must be construed with reference thereto.
■ By the appropriation Act of March 3, 1885 (23 Stat.L., 376), it was provided:
“ For the investigation of certain Indian depredation claims, ten thousand dollars; and in expending said sum the Secretary of the Interior shall cause a complete list of all claims heretofore filed in the Interior Department and which have been approved in whole or in part and now remain unpaid, and also all such claims as are pending but not yet examined, on behalf of citizens of the United States on account of depredations committed, chargeable against any tribe of Indians by reason of any treaty between such tribe and the United States, including the name and address of the claimants, the date of the alleged depredations, by what tribe committed, the *310 date of examination, and approval, with a reference to the date and clause of the treaty creating the obligation for payment, to be made and presented to Congress at its next regular session; and the Secretary is authorized and empowered, before making such report, to cause such additional, investigation to be made, and such further testimony to be taken as he may deem necessary to enable him to determine the kind and value of all property damaged or destroyed by reason of the depredations aforesaid, and by what tribe such depredations were committed, and his report shall include his determination upon each claim, together with the names and residences of • witnesses and the testimony of each, and also what funds are now existing or to be derived by reason of treaty or other obligation out of which the same should be paid.”
We will consider this act in connection with the act. of 1891.
Pursuant to those acts the Secretary of the Interior had caused to be examined and allowed numerous claims for the loss or. destruction of property by Indians and had, as therein ' provided, reported the same to Congress; but Congress for some reason did not see lit to make appropriations to pay the same. With numerous allowed claims so reported to Congress, and a still greater number pending in the Department for investigation, Congress passed the Act of 1891 (26 Stat. L., 851), the first section of which is as follows:
“Be it enacted, etc., That, in addition to the jurisdiction which now is, or may hereafter be, conferred upon the Court of Claims, said court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following, classes, namely:
“First. All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.
“Second. Such jurisdiction shall also extend to all cases which have been examined and allowed by the Interior Department and- also to such cases as were authorized to be examined under the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and under subsequent acts, subject, however, to the limitations hereinafter provided.
“Third. All just offsets and counterclaims to any claim of *311 either of the preceding classes which may be before such court for determination.”
Unless the act clearly expresses a different rule for the guidance of the court, it must be so construed as to apply to all citizens alike, who at the time the act was passed had claims which arose from the taking or destruction-of property by Indians “belonging to any band, tribe, or nation inamity with the United States, without just.cause or provocation on the l)art of the owner or agent in charge, and not returned or paid for.”
The first subdivision being broad, and including “all claims for property of citizens of the United States taken or destroyed by Indians ” irrespective of the treaty relations of such Indians, does the second subdivision-limit the first subdivision to such claims of citizens as accrued against Indians not under treaty relations, and did Congress intend by the second subdivision to confer on the court a separate and distinct jurisdiction to inquire into and finally adjudicate what are termed “ allowed” claims and claims which the Secretary of the Interior was authorized to examine as there set forth; and, if so, upon what basis'? Congress must have known when the act was passed that there were very few tribes not under treaty relations, and that some claims had been allowed against such Indians under the act of 1831 which were included in the second subdivision as allowed claims.
The language of the act in the jurisdictional clause is:
* * * “Said court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following classes, namely:
“ First. All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation in amity with the United States.” * * *
That clearly and unmistakably includes “all claims for property of citizens * * * taken or destroyed by Indians,’’ provided such Indians belong “to any band, tribe, or nation in amity with the United States.” It is conceded by the claimant that the amity of the tribe to which such depredat-ing Indians belonged was an essential x>rerequisite to compensation, from the date of the acts of 1796 and 1834 down to the act of 1872, by which latter act the claimant contends *312 Congress obanged tbe policy as to claims arising under “treaty stipulations;” and that as to such claims the amity of the tribe was dispensed with, though the treaty contained no provision for the payment of claims arising in war.
It is also contended that this was the purpose of the act 1885, and the latter act being in effect incorporated into the remedial act 1891, it .should be so construed as to dispense with the jurisdictional requirements of the first subdivision. That is to say, the claimant contends in effect that the first subdivision includes “ all claims for property of citizen s * # * taken or destroyed by Indians belonging to any band, tribe, or nation in amity with the United States:” * * * provided sueh Indians were not in treaty relations with the United States; while as to claims covered by the second subdivision he contends that the court ■ acquires jurisdiction by reason o the allowance of the claims, whether examined and allowed under “ existing laws or treaty stipulations,” and that as to such allowed claims neither the amity nor the treaty relations of the Indians is jurisdictional. That as to such claims as the Secretary of the Interior was authorized to examine the treaty relations of the Indians and not amity is the test of jurisdiction. Such is the contention of the claimant.
The words in the jurisdictional clause of the act, “ all claims of the following classes, namely,” were evidently used because there were some claims which had been allowed by the Secretary and reported to Congress, and there were pending claims which he was authorized to examine by the act 1885, while there were other claims which he was not authorized to examine. The words, “either of the preceding classes,” in the third subdivision, were intended to give the United States the right to set up counter claims and offsets to all such claims, notwithstanding some may have been allowed and priority was given thereto under section 4. The whole act, considering the object in view, must be construed together.
We see no force in the argument that the language, in either case, shows an intention on the part of Congress to confer on the court separate and distinct jurisdictions to inquire into and finally adjudicate claims conceded to have the. same common origin, though separated in the act into classes. Every claim cognizable under the act arose from the taking or destruction of property by Indians. The test of *313 jurisdiction in tbe first subdivision, wbicb includes “ all claims for property of citizens * * * taken or destroyed,” is the amity of the Indians, about which there is and ean.bé no controversy. If that test is held applicable to claims only against Indians not under treaty relations, then the second subdivision musr e construed, in effect as a proviso to the first subdivision., as without such limitation “ all claims of citizens * * * for property taken or destroyed by Indians ” * * * must be inquired into and finally adjudicated under the jurisdictional requirements there set forth.
The second subdivision provides: “ Such jurisdiction shall also extend to all cases which have been examined and allowed by the Interior Department.” * * * That includes all claims which may have been examined and allowed by the Interior Department under the appropriation Act May 29,1872 (now Uevised Statutes sections 445 and 466), arising, as therein stated, “under existing laws or treaty stipulations,” as well as allowances made by authority of the act 1885 and subsequent Indian appropriation acts. Such allowed claims therefore include the claims of citizens and inhabitants which were examined and allowed under the provisions of the act 1834 without reference to the treaty relations of the Indians. If, therefore, the court acquires jurisdiction of such claims by virtue of their allowance, as contended by the claimant, the amity of the tribe, which was jurisdictional before the Interior Department, ceases tobejurisdictional here, and such claimants may recover, though their claims arose from open and flagrant war, unless the amity of the tribe be made a test of liability instead of jurisdiction, which we will notice later.
This, in our opinion, is an unanswerable objection to the claimant’s contention that “allowed” claims constitute a separate and distinct jurisdiction from those embraced in the first subdivision; for as to claims which were allowed in favor of citizens or inhabitants under the provisions of the act 1834, Avhere no treaty relations existed, there can be no controversy but that the amity of the tribe was jurisdictional before the Interior Department. And it will be observed that no provision is made in the act 1891, giving priority of consideration and judgment to claims allowed by authority of the act 1872, as there is to claims examined and allowed by authority of the act 1885 and subsequent Indian appropriation acts. It is not *314 controverted that as to claims, allowed by authority of the act 1872, “arising under existing laws,” the allowance had to be made in conformity to the provisions of the act 1834, as that was the only law on the subject in existence when the act 1872 was passed.
The amity of the tribe being therefore jurisdictional before the Interior Department, at least as to such claims, does the act 1891 make the allowance thereof conclusive on the court? If so, then the allowance of the claim is the test of jurisdiction; otherwise amity is the test, as provided in the first subdivision. That such allowances are conclusive on the court is not contended, and we will not attribute to Congress thefolly of having conferred on the court jurisdiction to inquire into and finally adjudicate claims the allowance of which the act makes conclusive. ' The allowances made by the Interior Department were merely advisory to Congress, and under the remedial act 1891 they come here for the court to inquire into and finally adjudicate.
The Secretary of the Interior also examined and allowed a large number of claims by authority of the Act of March 3, 1885 (supra), and subsequent Indian appropriation acts, which are included in the second subdivision as “allowed” claims. As to such claims it is provided- by section 4, act 1891, that they “ shall have priority of consideration by such court, and judgments for the amounts therein found due shall be rendered, unless either the claimant of the United States shall elect to reopen the case and try the same before the court.” * * *
The act 1885, it wül be observed, authorized the Secretary of the Interior to examine only “such claims as are pending, but not yet examined on behalf of citizens of the United States, on account of depredations committed, chargeable against any tribe of Indians by reason of any treaty between such tribe and the United States.” # # * If such claims were pending they must have been filed pursuant to law, so whatever rights had accrued to claimants for compensation accrued prior to the passage of the act of 1885, and that such rights might be inquired into and the liability of such Indians ascertained the act of 1885, etc., was passed. The act creates no liability, nor does it guarantee indemnity, while the act 1834 does both.
By this act the of Secretary of the Interior was restricted in *315 his examination oí pending claims not only to the citizenship of the claimant and to Indians under treaty relations, bnt to such Indians as were by treaty chargeable for the depredations committed. By this we understand Congress to mean depredations committed by Indians on the property of citizens which by express provision of such treaty they had agreed to pay. This limitation we take it was made that Congress might be advised as to what tribes had agreed by treaty to pay, such claims and the fund out of which the same should be paid before making appropriations therefor. The Secretary of the Interior was to report to Congress the “date and clause of the treaty creating the obligation for payment,” while the latter part of the act says: “Also what funds are now existing or to be derived by reason of treaty or other obligation out of which the same should be paid.” Congress wanted to know what funds were then existing or to be derived out of which such claims “should be paid.” The words “should be paid” are significant, as there was no law providing that such claims “should bepaid”except the act 1834. Such investigation was merely advisory to Congress. The Secretary in his report was to include “the names and residences of witnesses and the testimony of each.”
We are not aware of any provision in any treaty, other than an express provision for the payment out of annuities of depredation claims, that creates or reserves a fund for the payment of such claims.
Where, however, annuities are due such Indians by reason of treaty stipulations or otherwise Congress may reserve or create a fund therefrom and apply the same to the payment of such claims whether such Indians consent thereto or not, but the purpose of the act of 1885, as we read it, was (1) to ascertain the extent of the liability of such Indians, (2) to ascertain what Indians had agreed by treaty to pay such claims out of their annuities, and (3) what annuities were due out of which the samé “ should be paid.”
That Congress intended by the act 1885 that such pending claims of citizens should be investigated in accordance with the provisions of section 17, Act 1.834 (supra), there can be no doubt; and the Secretary of the Interior must have so understood and interpreted the act, at least in part; for as to claims not filed within three years he held them barred, as he did under *316 tbe act 1872, as shown by the case at bar and a number of other like cases which have come before the court. That holding was recognized by Congress by the Act May 15,1886 (24 Stat. L., 44), as follows:
u Indian depredation claims: For continuing the investigation and examination of certain Indian depredation claims originally authorized, and in the manner therein provided for, by the Indian appropriation act approved March third, eighteen hundred and eighty-five, twenty thousand dollars; and the examination and report shall include claims, if any, barred by statute, sucb fact to be stated in the report; and all’ claims whose examination shall be completed by January first, eighteen hundred and eighty-seven, shall be reported to Congress, with the opinions and conclusions of the Commissioner of Indian Affairs and the Secretary of the Interior upon all material facts' and all the evidence and papers pertaining thereto.”
The claim in suit was not barred by any provision of the treaty or by the acts of 1872 or 1885. These acts indicate the purpose of Congress — that is, that thspending claims of citizens so authorized to be examined were to be examined in conformity to the act 1834, whereby the amity of the tribe was essential before the Secretary of the Interior, notwithstanding the treaty relations of such Indians.
It will be observed that the act 1885 differs from the act 1872 in this, that in the latter neither citizen nor inhabitant is mentioned, and for the obvious reason that Congress considered the act 1834 as applicable to the claims which by the act 1872 the Secretary was authorized to examine.
The limitation in the act of 1885 to the investigation of such pending claims of citizens for depredations as were chargeable against the Indians by reason of any treaty was not an amendment to or substitute for section 17, act 1834, and did not authorize the Secretary of the Interior, in the investgation of such pending claims, to waive the requirements of said act. The appropriation act 1885, etc., merely placed at his disposal a fund,with direction to expend the same in the investigation of the pending claims of citizens for depredations committed chargeable against any tribe by reason of any treaty between them and the United States. The act did not authorize him to allow a claim found due simply because the Indians were in treaty relations, regardless of any promise on their part to pay such claims. What we have said with reference to claims *317 examined and allowed by the Secretary of .the Interior by authority of the act 1885 and subsequent Indian appropriation acts will apply equally to such claims as he was thereby authorized to examine, though the latter claims are not involved in this action.
If the act of 1891 had simply conferred on the court jurisdiction to inquire into and finally adjudicate, according to law, all claims for property taken or distroyed by Indians, would anyone doubt that such claims, including allowed claims and those authorized to be examined under the act of 1885, would have to be adjudicated under the provisions of the act of 1834? The act of 1891 in effect incorporated in the first subdivision the essential provision of the act of 1834, limiting claims, however, to' citizens, as did the act of 1885, and substituted the words “ without just cause or provocation’7 for the words “that if such injured party, his representative, attorney, or agent, shall in any way violate any of the provisions of this act by seeking or attempting to obtain private satisfaction or reven ge, he shall forfeit all claims upon the United States for such indemnification.” (This latter provision, however, applying only to the guaranty of indemnification by the United States, fell when the repealing act of 1859 was passed, and was omitted in devised Statutes, section 2156.)
The amity of the band, tribe, or nation under the act 1891 is essential to the jurisdiction of the court, while the taking or destruction must have been by Indians, otherwise there can be no recovery, and the description of the Indians committing such depredation, as “ belonging to any band, tribe, or nation in amity with the United States,” defines and limits the jurisdiction of the court. We are, therefore, of the opinion that amity is a test of jurisdiction in all eases. We are led to this conclusion because we find nothing in the act 1885 or subse-uent Indian appropriation acts authorizing the Secretary of the Interior, in the investigation of claims, to substitute treaty for amity, much less to allow a claim because such tribe had violated the peace and friendship clause of their treaty or engaged in hostilities when they had agreed by treaty not to do so, as such violations may have been by open and flagrant war, and probably was.
Or it may have been a defensive war on the part of the band or tribe, and “justifiable self-defense is no breach of the treaty *318 of peace. ’ It is a natural right, which can not be renounced. A promise to live in peace is only apromise not to attack without cause and to abstain from injuries and violence, unless the violence offered will admit of no other remedy than the exertion of open force, in which case it may be lawfully exercised. (Vattel’s Law of Nations, p. 448.)
There is nothing in the language of the act 1885, étc., which shows an intention on the part of Congress to confer on the Secretary of the Interior authority to examine and allow claims originating in war, thereby depriving the Indians of belligerent rights. The Indians, having been recognized in their tribal relations by the political departments of the Government, it will be presumed, in the absence of an express statute to the contrary, that the rights of such Indians as belligerents are to be respected by the courts.
The language, “such jurisdiction shall also extend to all cases,” etc., show that the purpose of Congress was to extend the jurisdiction of the court to such cases, notwithstanding they had been provided for by previous acts of Congress and some of them had been examined and allowed by the Interior Départment, and such precaution was evidently taken lest such cases might otherwise be barred. It will be observed that the word “extend” is used, showing that the jurisdiction conferred was extended so as to include the claims embraced in'the second subdivision.
In other words, such jurisdiction shall also include all cases which have been examined and allowed and such as the Secretary of the Interior was authorized to examine under the act 1.885, and this, we believe, was the purpose of the second subdivision, and that it was inserted by Congress out of abundance of caution, lest such claimants, having been given a standing before the Interior Department, might be'barred here. Otherwise, if jurisdiction is acquired by reason of the allowance of a claim and the authority conferred to examine pending claims, then the amity of the tribe,which was jurisdictional before the Interior Department .under the act 1834, will likewise become jurisdictional before the court under that act; but the jurisdictional provisions of the act 1834 as to the claims of citizens being incorporated in the first subdivision, act 1891-we think Congress intended that such claims should be adjudicated under the jurisdictional requirements of the latter act; *319 ^Revised Statutes, section 1066, prohibits this court from taking jurisdiction of claims against the United States “growing-out of or dependent on any treaty stipulation entered into with foreign nations or with the Indian tribes.” And inasmuch as the United States have by the act 1891 made themselves jointly liable with the Indian tribes for the taking or destruction of property if they can be identified, or assumed the obligation if they can not be identified, as provided in section 5 of the act, it is reasonable to presume that Congress did not intend to confer on the court jurisdiction to inquire into and finally adjudicate claims arising as by contract under treaty stipulations, and especially when the law on the subject is ample to mete out justice independent of such treaties.
“ The words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object which the legislature has in view. (Sec. 73, Endlich on Interpretation of Statutes.)
The court therefore, in harmony with the legislation on the subject from 1796 down and in accordance with the long-established policy of the G-ovqrnmeut against the payment of claims originating in war and in recognition of the Indian tribes as “ domestic dependent nations,” construes the jurisdictional requirements of the first subdivision as applicable to the claims covered by the second subdivision, as such claims constitute a part, if not the greater part, of “all claims for property of citizens of the United States taken or destroyed by Indians.” This construction is in harmony with the act and the equal rights of claimants who seek to have claims having a common origin adjudicated; while as to such claims as were authorized to be, and were in fact, examined and allowed by authority of the act 1885 and subsequent Indian appropriation acts, where neither party elects to reopen a case under section 4 (supra), and where nothing appears to the contrary, the court will presume that the requirements of the statute were complied with by the Secretary of the Interior in the examination and allowance of such claims, and render judgment accordingly.
We have thus far endeavored to answer the claimant’s contention that the court acquires jurisdiction under the second subdivision by reason of the allowance of a claim and by reason of the authority conferred on the Secretary of the Interior by the act 1885, etc., to examine pending claims; and if we *320 are correct in. our construction, it disposes of tbe defendants contention that if jurisdiction is thus acquired the amity of the Indians becomes a test of liability as to the United States. This latter contention is based on the assumption that the amity of the tribe was not jurisdictional before the Interior Department by reason of the treaty relations of the Indians.
We have endeavored to show that it was, and that the reference in the act 1885 to such Indians as were chargeable with such depredations by reason of any treaty between them and the United States was a limitation on the Secretary of the Interior as to the particular tribes of Indians against whom claims were authorized to be examined, and was for the protection of the United States in the ascertainment of a fund to guide Congress in making appropriations to pay such claims, and had nothing to do with the determination of the rights of the claimants, whose claims were then pending and whose right to indemnity out of annuities arose long before, under the act 1831; hence the act of 1885 must also be construed with reference to the act 1834.
The act of 1891 does not create a claim for the adjudication of the court, nor does it create any new liability against the Indians, but therein the United States assume existing liability. That is, under section 5, if the Indians committing the depredations are found liable, then the United States assume such liability jointly with such Indians, if they can be identified; but whether such Indians can be identified or not, the United States are liable only where a depredation has been committed “ by Indians belonging to any band, tribe, or nation in amity with the United States,” so that the primary liability is against the Indians, the wrongdoer, while the liability of the United States is secondary.
Section 2, act 1891, as well as the whole tenor of the act, is a recognition of the existence of these claims and the liability of the Indian tribes to pay the same out of their annuities, and provides “ that no suit or proceeding shall be allowed under this act for any depredation which shall be committed after the passage thereof.” The act is remedial, therefore, only for claims which existed prior to tire passage of the act. Jurisdiction acquired, the first thing for the court to determine is as to the existing liability against such tribe; for without such existing liability there can be none against the United States, *321 The defendants contend that the defendant Indians were not in treaty relations with the United States at the time the depredation complained of was committed. Although such relations are immaterial in the view we have taken except on the question of prima facie amity, we will briefly consider the question.
On or about September 17,1851, a treaty was negotiated with the defendant Indians and other tribes at Fort Laramie (Revisión Indian Treaties, pp. 1047,1048) and submitted to the Senate for ratification. The Senate advised and consented to the ratification with an amendment, reducing the period for the payment of annuities from fifty to ten years, and giving the President the right to extend the period five additional years. The modification was sent to the tribes for their concurrence, and the defendant Indians and some other tribes consented, while others refused, and the treaty was never formally ratified. It was, however, acted upon by Congress, and appropriations were made to carry it into effect with tlie defendant Indians from March 3, 1853 (10 Stat. L., 238), until March 3,1865 (13 Stat. L., 550), including the extension of five years made by the President.
A treaty was also concluded with the defendant Indians— the Ogalalla band of Sioux — at Fort Sully, October 28, 1805, which was ratified by the Senate March 5, 1866, with an amendment, as provided might be done by article 6, and the treaty was proclaimed by the President March 17, 1866 (14 Stat. L., 747). The contention is that the treaty was signed by only three Indians — headmen or chiefs, — and that they were not authorized to act in that capacity for the band; and, further, that those who signed the treaty were induced to do so by undue influence.
The claimant contends that the latter treaty was in force when the depredation complained of was committed, and was so considered by the Secretary of the Interior and acted upon by Congress in making the appropriation of 110,000 per annum provided for in article 4 from July 26,1866 (14 Stat. L., 274), to July 27,1868 (15 Stat. L., 216), after which time annuities were paid under the new treaty of April 29,1868 (15 Stat. L., 635).
Even if the contention of the defendants is correct, the court can not inquire into it (Doe v. Braden, 16 How., 657.) Such *322 treaties may be rescinded or abrogated by act of Congress (Love v. Pamilin, 21 Fed. Rep., 755; Mackey v. Coxe. 18 How., 100; Elk v. Wilkins, 112 U. S., 94.) When a treaty bas been executed, and ratified by tbe Senate and proclaimed by tlie President, courts will presume that such treaty was lawfully made. This question was passed upon in the case of Fellows v. Blacksmith (19 How., 366, 372), where it was said:
“An objection was taken on the argument to the validity of the treaty on the ground that the Tonawanda band of the Seneca Indians were not represented by the chiefs and headmen of the band in the negotiations and execution of it. But the answer to this is that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can behind an act of Congress. (1 Cranch, 103; 6 Pet., 735; 10 How., 442 ; 2 Pet., 307; 3 Story Const. Law, ,p. 695.)”
This question is so well settled, that we deem it unnecessary to pursue the matter further.
The claimant asks the court to include in its findings of fact the departmental construction in the examination and allowance of claims under the act 1885, etc., which we have done, and he contends that the court should adopt such construction in the adjudication of such claims under the act 1891.
If wé are right in our construction of the act, it follows that the departmental construction, to the effect that where treaty relations existed amity was not jurisdictional before the Department, was incorrect.
The refusal of Congress to make appropriations to pay claims thus allowed and committing them to the jurisdiction of the court for adjudication would seem to support the view*- we have taken.
Departmental construction is always entitled to great weight and respectful consideration, and where doubt or ambiguity exist such construction has ordinarily been followed by* the courts. (Moore’s Case, 95 H. S., 760,763, and cases there cited).
In speaking of the construction of a statute by departmental officers, charged with its execution, Endlich on Interpretation Statutes, sections 360, 361, says such construction—
“Will, in cases of doubt and ambiguity, but, it is said, only in such cases, be adopted by the courts, or at least not disregarded *323 by them, except for cogent reasons. As, however, no such, mage can alter the lato, it can not, in any proper sense, be binding upon the courts, bound as they are to construe all laws coming before them according to their own judicial views. Nor, on the reenactment of a statute, with additions, would the departmental construction of the 'original act control the construction of the neto one, especially where this would make some part of the addition repugnant to the body of the enactment.” * * *
In Tanner’s Oase (147 U. S., 661, 663) it was said: “ The construction given to an act by the Department charged with the duty of enforcing it is material only in case of doubt.”
To the same effect also is the Graham Oase (110 U. S., 219), where it was said:
“Such being the case, it matters not what the practice of the Department may have been or how long continued, for it can only be resorted to in aid of interpretation, and it is not allowable to interpret what has no need of interpretation.”
See also Pugh’s Case (99 U. S., 265, 269), Swan’s Case (19 C. Cls. K.., 51, 71). But the claimant contends in this class of claims that Congress has ratified such departmental construction by reenactment. Where a statute has been judicially construed and a subsequent act incorporates the same words it will be presumed that such new statute is to be construed the same as the old. (Endlich on the Interpretation of Statutes, secs. 365, 367, 368.)
The decisions to which our attention has been called in other cases argued before the court, and particularly in the Marks case, to which we are referred, apply only to the ratification by reenactment of statutes which have received judicial construction. The authorities cited are Duramus v. Harrison (26 Ala., 326), Myrick v. Hasey (27 Maine, 9), Cota v. Ross (66 Maine, 161, 165). See also Tuxbury’s App. (67 Maine, 267), Frink v. Pond (46 N. H., 125, following Tomson v. Ward, 1 N. H., 9), State v. Swope (7 Ind., 91), Evans v. Ross (107 Pa. St., 231), Gould v. Wise (18 Nev., 253), Woolsey v. Cade (54 Ala., 378), Re Murphy (23 N. J. L., 180).
From an examination of the authorities cited it will appear that they apply only to statutes which have received judicial construction, and we are aware of none otherwise.
In the Swift, Courtney and Beecher Co. Case (14 C. Cls. R,., 481), where the Secretary of the Treasury had construed a statute providing for a commission of 10 per cent to mean a *324 commission payable in stamps and not in cash, and where a large amount of money had been collected under such construction and purchasers had acquiesced in it, and Congress in revising and reenacting the statute making no change in the practice, the court declined to reverse the practice by giving a different construction. But on appeal the Supreme Court reversed the case (105 U. S., 691, 694; 111 U. S., 22).
This would seem to be decisive of the claimant’s contention that the court should be guided in the adjudication of claims examined by authority of the act of 1885 by the construction given thereto by the Secretary of the Interior. The construction given to the act by the Secretary of the Interior was not ratified or sanctioned by Congress. On the contrary, Congress refused to make appropriations to pay the claims thus allowed; and while in effect incorporating the act 1885 in the remedial act 1891, it was for the purpose of giving such claimants a standing in this court for the adjudication of their claims under the act 1891 and not under the act 1885.
If the construction of the Secretary of the Interior is binding on the court under the act, then the allowances made by him thereunder are conclusive, and the court is shorn of judicial discretion by the act which confers jurisdiction “ to inquire into and finally adjudicate” such claims. Adjudicate means to “try and determine; to come to a judicial decision.” That can only be done by the exercise of judicial discretion, such as in our opinion is clearly conferred on the court by the act in the adjudication of such claims.
The Secretary of the Interior was not called upon to construe the act of 1891, and it is by virtue of this act alone that claimants are given a standing in the couro, and by this act, therefore, their rights must be determined. The act merely ratifies the action of the Secretary as to such claims allowed by him as he was authorized to examine and allow. The jurisdictional requirements before him under the act of 1834 are embodied in the act of 1891, and therefore become jurisdictional here under the latter act.
It is contended by the claimant, in effect, that when a treaty is entered into by the United States with an Indian tribe the presumption is conclusive that such tribe was at the time in amity with the United States, and that such presumption holds until such treaty has been abrogated by the treaty- *325 making power or annulled by proclamation of tbe President, as lie is empowered to do by Revised Statutes, section 2180, Act July 15,1862 (12 Stat. L., 528). Tie Indian tribes being u domestic dependent nations,” and in a sense the wards of the nation, subject to the jurisdiction and control of the United States, lends force to this contention. Where the political departments of the Government have not abrogated or annulled such treaty, but continue to recognize its binding force by making appropriations to carry the same into effect and for the payment of annuities stipulated therein to be paid, and such annuities have not been withheld from such tribe by reason of any hostilities on its part against the United States or their citizens, as provided may be done by the Act March 2, 1867 (14 Stat. L., 515), now Revised Statutes, section 2100, the presumption is that such tribe was recognized by the United States as in amity therewith during such period. But such presumption is not conclusive of the amity in fact of such tribe. Where such recognized condition appears, it will materially strengthen the presumption of amity arising from the treaty relations of such tribe, and in the absence of any affirmative proof to the contrary will be held as conclusive.
Whether the tribal relations of the Indians were changed by the Act March 3, 1871 (Rev. Stat., sec. 2079), prohibiting treaties with them as independent tribes or nations, we need not now inquire, as by the same act it is provided in substance that treaties theretofore ratified shall not be thereby invalidated or impaired, and the depredation in this case having been committed prior to the passage of that act, the amity of the band or tribe is therefore to be determined as of the date of the depredation.
The Indians being within the jurisdiction and control of the United States as “domestic dependent nations,” it is their duty to submit to the constituted authorities; but if, instead of submitting, they resort to arms, as a band, tribe, or nation, to maintain or contest their rights, a want of amity in fact arises, and by reason of their recognized tribal relations by the political departments of the Government and the favorable rules of interpretation to which they are entitled their rights as belligerents will be respected by the court in construing the remedial act of 1891.
*326 While the words ‘‘band, tribe, or nation in amity with the United States” mean a condition of peace and friendship between such band, tribe, or nation and the United States, and the absence of such condition implies a want of amity, yet it is not always an easy matter to determine what state of facts must exist to constitute such condition.
Ili feeling- may exist between such tribe and the citizens in a given locality with or without just cause on the part of such tribe, but unless such tribe resort to a wanton destruction of life and property, the condition of amity on the part of such tribe toward the United States will not thereby be changed; nor will a mere raid by such tribe on the citizens for the purpose of idunder, evidenced by their acts, constitute a condition of hostilities toward the United States, unless the troops of the United States are called into requisition to suppress such raid and the tribe resists with arms. (AKre’s Case 1 C. Ols. It., 233-238.)
Where a small party of Indians or a minority of a tribe, without the consent of sueh tribe, engage in sucli a raid, though they encounter United States troops and engage them in battle, the condition of amity between such tribe and the United States will not thereby be changed.
In other words, the amity of the band, tribe, or nation with the United States is alone involved under the act of 1891, and that condition may exist, though a small party therefrom, as in the case at bar, raid on the citizens and commit depredations.
The facts found show that at the time of the depredation complained of the defendant Ogalalla band of Indians was quiet and there was no apprehension of open hostilities therefrom.
From the report of the Commissioner of Indian Affairs, found in Senate Ex. Doc. No. 13, page 2, referred to in the findings, it appears that the massacre of the friendly and helpless Cheyenne Indians at Sand Creek, Colorado, in December, 1864, precipitated a general war among the Indians. That report says :
Exasperated and maddened by this cold-blooded butchery of their women and children, disarmed warriors, and old men, the remnant of these Indians sought the aid and protection of the Comanches and Kiowas, and obtained both. The combination which followed embraced all the tribes of the plains from the Eed Eiver of the South to the lied Eiver of the North, and resulted in the general Indian war of 1865, which cost *327 our people many -valuable lives and $40,000,000 in money. Peace was concluded with the southern tribes in October, 1865. Peace was likewise made with the Missouri River Indians late in the same autumn, and the Indians engaged in the recent hostilities (Sioux) gave notice that they also were willing to bury the tomahawk. (Report Committee on Indian Affairs, Senate Ex. Doc. No. 13, p. 2.) ”
Reference is there made to the treaty concluded with the hostile Sioux Indians in October, 1865, which includes the treaty made with the Ogalalla band, and, further, that the Sioux Indians were then “willing to bury the tomahawk,” both of which show a condition of peace at that time. That treaty was proclaimed March 17, 1866.
The winter which followed was a severe one, and the Secretary of the Interior, in his report for 18.66-'67, page 2, referred to in findings, says:
“ Previous to February last (1866) the great body of these Western Indians were hostile and had committed many of the most wanton and cruel outrages upon the western emigration passing through the country which they inhabit. Indeed, they had become so bold and reckless, that they attacked and destroyed emigrant trains within 30 miles of Fort Kearney, a point only 200 miles west of Omaha. The various military expeditions sent against them by the Government had failed to inflict upon them any serious punishment, and the young men of the tribe had come to believe that these atrocities might be continued without the slightest fear of serious consequences.
The winter of 1865 proved to be one of unusual severity, however, in the region which they inhabit, and the long-continued cold weather (with snows of almost unprecedented depth) accomplished, in the interests of peace, what war, waged at great expense, had failed to achieve.' In February, 1866, a deputation of Indians representing the Sioux, by fair the most numerous and powerful of these tribes, reached Fort Laramie, and through an interpreter communicated with Col. Henry E. Maynadier, then, as now, in command of the district iii which that important military post is situated. They represented to Col. Maynadier that their tribes were in a condition of utter destitution, without food and scantily supplied with clothing; that their blankets were worn out, their horses and ponies nearly all dead, and that their young men were tired of war and desired the reestablishment of peace. Col. Maynadier listened patiently to the story of their destitution and sufferings, and assured them that the Government was earnestly desirous that terms of peace and friendship should be reestablished. Provisions and tobacco were issued to them, and they returned to their tribes-
*328 Early in March several of the chiefs, with portions of their bands, arrived at Fort Laramie, and a telegraphic correspondence was held between them and the undersigned, who had during the preceding winter been appointed by the President a member of a commission to negotiate, if practicable, terms of peace. In that correspondence (a full report of which was at that time forwarded to the Indian department at Washington) it was agreed, on the part-of the chiefs, that all hostile action on the part of the bands which they represented should be suspended until the fixed time for the assembly of the peace commission at Fort Laramie on the lstof June folio wing. This agreement was faithfully observed by the Indians, and no depredations were committed by any of the lately hostile bands.”
In Senate Ex. Doc. No. 13 (supra, pp. 3-61) it is said:
“ The only one of the Prairie Sioux who remained and agreed to abide by the treaties were the Lower Brules, with a few stragglers from the other tribes. At that time they numbered about 2,500, but a year later, June, 1867, Spotted Tail, Standing Elk, and Swift Bear, the treaty chiefs, had with them only ten lodges, mostly of old men and squaws, the young men having gone to swell the ranks of lied Cloud. So rapid was the defection of warriors to the hostile camp, that within two weeks after the passage of the trooj)s Spotted Tail and Standing Elk told the whites that their young men had left them and gone to the Powder Biver country, and that parties who went far from home had best go prepared and look out for their hair.” (See ‘Massacres of the Mountains7 and Senate Ex. Doc. No. 13, pp. 3 and 61.)
The troops, it will be observed, did not reach Fort Beno until June 28, and the Indians manifested no objection to the occupation of old Fort Beno by the military authorities. Their objection was to the establishment-of military posts west and north of that point. The troops did^ not leave Fort Beno until July 10. (Senate Ex. Doc. No. 33, Fiftieth Congress, first session, pp. 9,10.)
From the same executive document (pp. 2, 3, etc.) it apir ears that what was known as the “mountain district” was organized April 13,1866, by order of Máj. Gen. Pope, IT. S. Army, and Col. Henry B. Carrington, U. S. Army, was assigned to the command. The district thus organized contemplated the establishment of three military posts from near Fort Beno to the Upper Yellowstone Biver, and included the territory wherein the depredation complained of was committed. On the 19th of May following Gen. Carrington, with his command, marched from Fort Kearney, Nebr., to Laramie, reaching there June 14.
*329 On tbe 16tb June (p. 6) be reported bis arrival at Fort Laramie, and while tbe commissioners, then at that place to negotiate treaties witb tbe various bands and tribes, informed bim that be was going to occupy a region wbicb the Indians would only surrender for an equivalent and that bis arrival bad started absurd rumors, still be says (p. 6) be apprehended no “ serious difficulty.” Continuing tbe march witb bis command, Gen. Carrington reached Fort Reno June 28, and on that day reported bis arrival to tbe adjutant-general at Omaha, in wbicb be said in tbe conclusion of bis communication (p. 8):
* * * “No Indians were met en route, and tbe parking of tbe trains and systems of pickets must have kept them out of sight. The day before we reached tbe ferry three Indians drove away two horses within half a mile of tbe ranch midday. Tbe command came through in good order.”
On July 1 be reported to tbe same officer (p. 8) that on the day previous Sioux Indians, seven in number, bad driven off a herd of mules belonging to tbe claimant, who was post sutler.
July 10 following the command marched westward, and on tbe 13th July encamped at a place called Piny Fork, on the Powder River, and on tbe next day, in company witb a small detachment of officers and men, be reconnoitered the country for a scope of 70 miles, and says (p. 9) it “ was made without meeting Indians.” No attack.of any kind, other than depredations by small parties, appears to have been made by the Indians until July 17, when tbe train under tbe command of Maj. Haymond was attacked and 175 bead of stock run off.
Although it is evident from tbe various public documents referred to in tbe findings that tbe Sioux Indians, including tbe defendants in this action, were opposed to tbe location of tbe military posts north of Fort Reno wbicb Gen. Carrington was ordered to establish because it materially interfered witb their bunting grounds, and while they were doubtless thereby aggravated and provoked to commit depredations they might not otherwise have done, yet there were no acts of open hostility on tbe part of tbe defendant, tbe Ogalalla band, toward tbe United. States or their troops until long after tbe date of tbe depredation complained of.
The suspension of all hostilities agreed upon at Fort Laramie in March witb tbe commission until their meeting in June following, as shown by tbe report heretofore set out, was kept in good faith by tbe Indians, and while tbe Ogalalla band, under *330 their chief lied Cloud, refused to sign the treaty and withdrew, doubtless with ill feeling, there appear to have been no acts of hostility on its part until after the depredation in this case.
These communications from Ool. Carrington, the officer in immediate command of the military forces in the district where the depredation was committed and who reported the depredation in this particular case the next day after its occurrence, adding, “My own herds were not touched, haying armed men in charge,” would seem to show beyond question that the purpose of the Indians was not war, but theft.
We are therefore of the opinion that at the time of the depredation the defendant, the Ogalalla band of Sioux Indians, was in amity with the United States.
The defendant, the Ogalalla band of the Sioux tribe, of Indians, haying been in separate treaty relations with the United States at the time of the depredation set forth in the findings, and Congress haying by the act of 1891 recognized such band in the jurisdictional requirements of the act as to amity, we think it was intended by Congress that the band should be held liable for the yalue of the property so taken, notwithstanding the provisions of sections 5 and 6 of the act concerning judgments against the tribe. And especially do we think this correct, since all the other bands of the tribe may have been engaged in war at the time of the depredation, and for that reason not in amity with the United States. Where the political departments of the Government have recognized a band for the purpose of a treaty and xirovided therein for the payment of annuities to such band sex>arate and distinct from the annuities xiaid to the tribe or other bauds of the tribe, we think it a sufficient recognition of the band to warrant a judgment against it.
The claimant was at the time of the dexiredation a j>ost trader or sutler, moving with the army, x>resumably by authority, but he was in no wise responsible for the movement of the troops, and it is not shown that he or his agent in charge in any way provoked the Indians to take his stock, or that they in fact know whose stock it was when they took it.
Our conclusion is that the claimant has established his right to recover the sum of $5,100 against the defendants, the United States and the Ogalalla band of Sioux Indians, and judgment will be entered accordingly.
*331 Tbe petition as to tbe other defendant Indians is dismissed.
Davis, J., and Nott, J., concurred in tbe opinion of tbe court, except upon tbe question of jurisdiction and tbe construction wbicb should be given to tbe first and second jurisdictional clauses of tbe act, as to wbicb their views are set forth in tbe succeeding case of Love, administrator of Karris.
APPENDIX.

Indian treaties malting provision as to payment out of annuities for depredations committed on the property of white men.

[The references by pages are to tbe Revision of Indian Treaties,” 1873.]

a The United States agrees to appropriate $100,000 to pay for depredations and forcible exactions.
b The United States agrees to pay for all depredations since 1815. o Depredations committed since 1814 are to be paid by tbe United States in consideration of the cession of Indian lands. d Tlie United States agrees to pay for all depredations since 1808. e The United States agrees to pay all depredation claims.