THOMAS N. CUTLER, Plaintiff, *v.* THE STEAMSHIP COLUMBIA AND OWNERS, Defendants.

*Appeal in Admiralty, Washington.*

1. New evidence cannot be received in this court in Admiralty causes.
2. A rehearing will not be granted for newly discovered evidence, unless it appear that the evidence is new, and not cumulative, and that the application could not have been made in the District Court.
3. Where a collision occurred between a steamship going down, and a brig coming up the Columbia River—*Held*, that the steamship was guilty of the primary and greater fault:—1st. Because she was running close to the larboard shore; 2d. Because she was running down stream in the night, at full speed, when there was danger of meeting other vessels; 3d. Because she incautiously attempted to pass between the brig and the shore.

HOLBROOK, for the defendants, asked leave to introduce new evidence in this cause, which was opposed by Campbell, for the plaintiff.

*A. Holbrook*, for defendants.

*A. Campbell*, for plaintiff.

WILLIAMS, C. J.  The Admiralty practice, which has grown up under the federal judiciary acts and rules of court, is not the practice of this court.  The act of Congress creating this court is as high authority as any other act of Congress.  By that act writs of error, and appeals in causes of federal recognizance, are to be made to this court "the same as in other cases."  In no other case can new evidence be received in this court.  Chancery causes are heard anew, but on the same pleadings and proofs as in the District Court.  Admiralty causes must be governed by the same practice.

By the Court—Leave refused.

Holbrook then filed affidavits, and asked to have the cause remitted to the District Court for rehearing on newly discovered evidence.

OLNEY, J. It is indispensable to this application that it could not have been sooner made, and that the evidence be new and quite material. None of these conditions exist in this case. No good reason is shown why the application was not made in the District Court below; and besides, the same evidence is already in the record, testified by another witness.

By the Court—Application denied.

OLNEY, J. This is an appeal by the owners of the steamer from the decree of the District Court of Washington County, awarding six hundred dollars to the owners of the brig Francisco, for damages by collision. The District Court decided that the steamer was principally in fault, but that the brig might, by the exercise of ordinary attention and skill, have avoided the collision, and therefore divided the loss between them, and awarded the costs against the steamer.

It appears that the brig was running up the Columbia River before the wind, at the rate of five or six knots an hour, near the south or west shore, and the steamer was running down, at the rate of twelve or fifteen knots an hour, near the same shore. It was about ten o'clock at night; but the moon shone, and the vessels discovered each other at a considerable distance. The brig put her helm a-port, and the steamer put hers to starboard, each intending to run between the other and the shore; so that the course of each was across the track of the other. As the steamer was crossing the bow of the brig, the bowsprit of the latter ran into the steamer's paddle-box, and was carried away, with much of the works on the brig's starboard quarter. The injuries were repaired at an expense of about six hundred dollars, and the losses by detention were about six hundred.

As usual, each casts the blame on the other; and the cir-

Cutler *v.* The Steamship Columbia.

cumstances by which their conduct, after they saw each other, is to be judged, are obscurely developed by the evidence. But there are some general rules, recognised elsewhere, which navigators on this coast cannot too soon learn will be applied by the courts as tests of their care and skill. Among those relating to the navigation of frequented rivers, are the following : Vessels going down are entitled to the benefit of the current in the middle of the channel ; and vessels going up are entitled to the benefit of the eddies along the shore. Vessels bound either way, when they run near shore, are to take the shore on their starboard side, unless some local cause or other exigency makes the larboard preferable. A steam vessel, having occasion at night, or in a fog, to run on the larboard side, or, indeed, on either side, or, in any place where there is a known probability of falling in with other vessels, should slacken her speed, and increase her vigilance in proportion to the danger, and be momentarily on the alert to reverse her engines, or to make any manœuvre in her power necessary to the safety of other vessels.

Had the steamer been in the middle, or on the north side of the river, which, at that place, is near a mile in width, the two vessels would never have come into dangerous proximity. Or if, running in the night, on the side belonging to vessels bound up, against a wind of which such vessels would be certain to avail themselves, she had run at half instead of full speed, on discovering the brig, the more leisurely to watch her manœuvres, and had reversed her engines when danger became imminent, the accident hardly could have happened. The opinion of some of the witnesses, that checking her speed would have caused a more dangerous collision further forward on the steamer, must be understood to relate to the time when it had ceased to be in the steamer's power to avoid it. The fact that full speed carried her only half way across the brig's path, proves that a reversal of her engines a minute before would have given the brig time to pass. That the necessity for this was, or ought to have been, seen in time, is certain. The witness, Frazier, a passenger on board the steamer,

standing in the purser's office, heard the steamer's pilot order the helm to starboard, and then repeat the order, and then exclaim, " Where is she coming to ?" Upon this the witness stepped out of the office, and saw the brig over the starboard bow, three or four hundred yards off, heading up stream. She changed her course to starboard, and the steamer changed her's to larboard, as if each would get between the other and the shore. He watched until he saw where the brig would strike the steamer, and then went forward to avoid the shock.

All the testimony, which is meagre enough, confirms this account, and shows that the steamer saw the danger in time to reverse her engines, and allow the brig to pass. Instead of which, she shot across the brig's bow with frightful velocity, almost at right angles. When there, it is true, she could only proceed, whatever the consequences. But that does not justify her being there. If she did not, and could not see the brig's manœuvres in time to check up and let her pass, it only proves how important it was that she should keep her own side of the river, or else run slowly and cautiously at night, in the known track of other vessels.

The evidence does not authorize a decided opinion, whether the steamer erred in putting her helm to starboard when she saw the brig. It was a departure from an important rule, the observance of which would have carried these vessels by in safety. She may, as she claims, have seen the brig on her starboard bow. But she knew the brig was under full sail before a fair wind, and it was taking a great risk to presume the brig would make the wrong manœuvre, in anticipation of the steamer's taking the wrong side. But if she saw the brig too late to take her own side of the river, it does not excuse the previous fault of being on the wrong side, nor the subsequent reckless speed with which she intercepted the brig. If either of these errors had been avoided, the accident would not have happened.

That the steamer was under the command of a licensed pilot might protect the master, when sued by his owners, but it does not protect the ship, or her owners, whose servant the

pilot was. The conduct of the brig must also be examined. She was navigating in her proper place, and made the right manœuvre when she saw the steamer. Even if she saw the steamer on her starboard bow, she was right in expecting that vessel to put her helm a-port, and take the half mile or more of channel that lay open to her on her proper side. But her pilot testifies that he heard the steamer's helm ordered to starboard. If, up to that time, she was right, which she doubtless was, in acting on the presumption that the steamer would take the other side, she now knew, or, if skillful and attentive, she would have known, that unless she too put her helm to starboard, the steamer would cross her bow. Not to see this was want of skill—not to act upon it was want of prudence. Her pilot says he would have kept his course if it had split him; and that the danger was so suddenly upon him, that there was no chance for escape. But this door of escape was open. True, it was on the wrong side; but, being the only one, made it the right one for that occasion. Whether she had time and space to turn away, the witnesses differ in opinion. But when we consider that the order to starboard helm was given both times before Frazier came out of the purser's office, and that, by keeping her course, she did not reach the steamer's path until the latter had nearly passed, it is difficult to believe she could not, at the rate she was moving through the water, have turned her head aside. It was sudden, but not without warning. Her pilot knew that he was meeting a powerful steamship, and was told by the mate that she was coming directly towards him. He should not have been taken by surprise. He should have required no time for deliberation when he heard that order on board the steamer. That degree of attention and skill, which ordinary seamen would, under those circumstances, have put in use, would almost certainly have prevented the collision.

But as the primary and greater fault was with the steamer, whose gross misconduct brought both vessels into danger, it is not so much justice as public policy which requires the loss to be divided, lest navigators might be encouraged to forego the necessary exertions in similar circumstances.