Peelle, J.,
dissents:
In respect of the claim of the Wichitas, codefendants herein, to the title to the land in dispute by right of original occupancy or pristine habitat,” I concur in the conclusion of the majority of the court, but my view of the case as to the claimants’-rights under the treaty of 1866 leads me to dissent from the conclusions reached by the court in their case.
The controversy is as to whether the cession of land by them to the "United States under the treaty of 1866, absolute in terms, can be construed by the court, under the special act of our jurisdiction, from external facts and circumstances as a cession in trust.
There are, however, some preliminary questions which I will first notice, though not material in the view I take of the case.
Prior to 1855 the Choctaw and Chickasaw nations of Indians had acquired by treaties in fee simple, subject to occupancy, certain lands west of the Mississippi Eiver, lying between the Eed and Canadian rivers, in exchange for certain lauds belonging to them east of the Mississippi Eiver. (7 Stat. L., 210, 333-605.)
June 22,1855, a treaty was entered into between them and the "United States (11 Stat. L., 611), by the first article of which the Choctaw and Chickasaw country was defined by certain boundaries east of the one hundredth degree of west longitude, and pursuant to the act of May 28,1830 (4 Stat. L., 411), the lands embraced within the limits so described were guaranteed *150 to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common, “ so that each and every member of either tribe shall have an equal, undivided interest in the whole,” with the proviso that the land shall not be sold without the consent of both tribes,” and that in case “ the Indians and their heirs shall become extinct or abandon the same” it should revert to the United States.
By article 9 the Choctaws quitclaimed and relinquished “ to the United States all their right, title, and interest in and to any and all land west of the one hundredth degree of west longitude,” and by the same article the Choctaws and Chickasaws leased “ to the United States all that portion of their common territory west of the ninety-eighth degree of west longitude for the permanent settlement of the Wichita and such other tribes or bands of Indians as the Government may desire to locate therein, excluding, however, all the Indians of New Mexico, and also those whose usual ranges at present are north of the Arkansas Eiver and whose permanent localities are north of the Canadian Eiver, but including those bands whose permanent ranges are south of the Canadian, or between it and the Arkansas, which Indians shall be subject to the exclusive control of the United States, under such rules and regulations, not inconsistent with the rights and interests of the Choctaws and Chickasaws, as may from time to time be prescribed by the President for their government: Provided, however, The territory so leased shall remain open to settlement by the Choctaws and Chickasaws as heretofore.”
In consideration of the foregoing relinquishment and lease, the United States, by the provision of article 10, paid to the Choctaws $600,000 and to the Chickasaws $200,000, that being their proportionate interest in the territory leased, as then and thereafter by certain treaties fixed; but what portion of the sums so paid, if any, about which there is a controversy, was in consideration of the relinquishment of the lands west of the one hundredth degree of west longitude by the Choctaws alone does not appear.
By the treaty of October 18,1820 (7 Stat. L., 211), the United States had ceded to the Choctaw Nation lands west of the Mississippi Eiver described as follows:
“Art. 2. For and in consideration of the foregoing.cession on the part of the Choctaw Nation,- and in part satisfaction *151 for tbe same, the commissioner of the United States, in behalf of said States, do hereby cede to said nation' a tract of country west of the Mississippi Eiver, situate, between the Arkansas and Eed rivers, and bounded as follows: Beginning on the Arkansas Eiver where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian Fork, and up the same to its source; thence due south to the Eed Eiver; thence down Eed Eiver three miles below the mouth of Little Eiver, which empties itself into Eed Eiver on the north side; thence a direct line to the beginning.”
The controversy grows out of the language of the description — i. e., “ thence up the Arkansas to the Canadian Forlc, and up the same to its source; thence due south to the Red River.”
The source of the Canadian Fork at that time was supposed from the maps theretofore made to be at or east of the one hundredth degree west longitude; and therefore the cession by that treaty could hardly have been intended by the parties to include any land west of that line, and besides, at that time the western boundary of the United States was the one hundredth degree west longitude.
Later maps show the source of the Canadian Fork to be far west of the one hundredth degree west longitude, while the westernmost point of the Eed Eiver is about 2 degrees east thereof, so that the line from the source of the Canadian Fork “ thence due south to the Eed Eiver” could not be run. Hence it is evident that the parties understood the source of the Canadian Fork to be at or east of the one hundredth degree west longitude, as shown by the maps as they existed in 1820; and inasmuch as subsequent to the treaty of 1820 the United States acquired from Spain the territory west of the one hundredth degree west longitude (8 Stat. L., 251), and thereafter by treaty of' 1830 (7 Stat. L., 333) the lands so ceded were restricted east of the one hundredth degree west longitude and the provisions of all prior treaties “declared null and void,” the quitclaim and relinquishment of the territory west of that line was evidently to correct or restrict the boundaries thus shown by the maps at that time.
In transmitting the treaty of 1820 the commissioners appointed to negotiate it said, among other things, from an examination of the map you will find that Little Eiver is about 60 miles above the Great Eaffc on Eed Eiver, and that we have located the Choctaws as high up the same as practicable.” *152 From this it is safe to assume that the commissioners had before them a map at the time of the treaty; and as there is no evidence showing or tending to show that the Choctaws at that time had any other or.different knowledge on the subject than that shown by the maps of that day, in evidence, I conclude that the western boundary of the land ceded was understood by the parties to the treaty to be as indicated on said maps. Therefore the relinquishment by the Choctaws of all their right, title, and interest in and to the lands west of the one hundredth degree of west longitude was but a correction of the cession of 1820 in conformity with the intention of the parties; and hence that no part of the $800,000 paid was in consideration of the relinquishment; and such seems to have been the understanding of the parties at the time, judging from the proportionate amounts received for their respective interest in the lands east of the 100° west longitude; and it also seems to have been the understanding of the Commissioner of Indian Affairs, as expressed in 1880. (House Ex. Doc. No. 82, 36th Cong., 1st sess., p. 3.)
But I do not regard this as material, as it only goes to the question of the adequacy of the consideration for the leased district, or rather to the good fa.ith of the United States in thus procuring the relinquishment and lease, neither of which questions are within the province of judicial investigation. The good faith of the United States must not only be presumed, but must be assumed, in all treaty stipulations.
The United States having acquired the leased district for the permanent settlement of the Wichita and other Indians, as specified in article 9 of the treaty of 1855, “ subject to the exclusive control of the United States, under such rules and regulations not inconsistent with the rights and interests of the Choctaws and Chickasaws as may from time to time be prescribed by the President for their government,” a trust was thereby created in the United States for the purposes therein set forth.
No term for the leased district was fixed, but as the purpose of the lease was for “ the permanent settlement of the Wichita” and other Indians as therein provided, the presumption may. fairly be indulged that the Choctaw and Chickasaw tribes parted with their interest in the lands perpetually except as to the right reserved under the proviso, i, e., “ the territory so *153 leased shall remain open to settlement by the Choctaws and Chickasaws, as heretofore.” But this right they had not exercised np to the time of the treaty of 1866.
Upon the lands thus acquired, and in conformity with the treaty, the United States located, among others, the Wichita Indians in 1859. They were located in the northeast corner of the leased district, and while the boundaries of their reservation were never legally fixed, still the boundaries specified in the unratified agreement between them and the Commissioner of Indian Affairs have been accepted as showing the extent of their reservation, thus allowing them for a permanent settlement, and to hunt over, about 743,257.19 acres of land, being the lands covered by the agreement of 1891 between the United States and the Wichitas, which is the immediate subject of this litigation.
The district leased, thus held by the United States, containing about 7,713,239 acres, was treated as held in trust for the use and purpose of settling friendly Indians therein, as provided by the treaty of 1855, at least until 1861, when the Choctaws and Chickasaws, doubtless because of their being slaveholders, early declared through their respective legislatures their purpose by resolution (Beb. Bee., vol. 1, p. 682, and vol. 3, pp. 5S5, 587), and soon thereafter allied themselves to the Southern Confederacy by treaty (Oonf. Stat. L., pp.311, 331), and took up arms against the United States (Beb. Bee., vol. 3, pp. 593, 648), and thereby forfeited their rights to annuities and protection from the Government and also to their lands, and were “considered as at the mercy of the Government,” as they were informed at the council at Fort Smith-in 1865 (Bep. Commr. Ind. Affs., 1865, p. 34).
However, at the close of the war, slavery having been abolished in the slave States, the United States were desirous of renewing friendly relations with their late rebellious wards, and to this end treaties were entered upon for the purpose of modifying and fixing their rights in respect of the lands ceded to them prior to the civil war, and also of making provision for those persons who had been held by them in slavery.
Preliminary to the treaty of April 28,1866 (14 Stat. L., 769), a council was held September, 1865, at Fort Smith, Ark., between representatives of the various Indian tribes, including the Choctaws and Chickasaws, and the commissioners on the *154 part of the United States, at which the Indians were informed that new treaties would have to be made, embodying substantially the following propositions :
“1. Bach tribe must enter into a treaty for permanent peace and amity with themselves, each nation and tribe, and with the United States.
“2. Those settled in the Indian Territory must bind themselves, when called upon by the Government, to aid in compelling the Indians of the plains to maintain peaceful relations with each other, with the Indians in the Territory, and with the United States.
“3. The institution of slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for.
“4. A stipulation in the treaties that slavery or involuntary servitude shall never exist in the tribe or nation, except in punishment of crime.
“5. A portion of the lands, hitherto owned and occupied by you, must be set apart for the friendly tribes in.Kansas and elsewhere, on such terms as maybe agreed upon by the parties and approved by Government, or such as may be fixed by the Government.
“6. It is the policy of the Government, unless other arrangements be made, that all the nations and tribes in the Indian Territory be formed into one consolidated government after the plan proposed by the Senate of the United States for organizing the Indian Territory.
“7. No white person, except officers, agents, and employees of the Government, or of any internal improvement authorized by the Government, will be permitted to reside in the Territory unless formally incorporated with some tribe according to the usages of the band.” (Keport of Secretary of Interior, 1805,482.)
There is a controversy between counsél as to the precise language of the fifth proposition. The defendants contend that the language is as given above, while the claimants contend that it was as follows:
Fifth. “A part of the Indian country to be set apart and purchased for the use of such Indians from Kansas or elsewhere as the Government may desire to colonize therein.”
The claimants’ counsel (Mr. Wilson) says: “That the Commissioner of Indian Affairs, in elucidation of the provisions contained therein with regard to the said fifth provision, addressed them as follows: ‘A portion of the lands hitherto *155 owned and occupied by you must be set apart for tbe friendly tribes now in Kansas and elsewhere, on such' terms as may be agreed upon by the parties and approved by the Government, or such as may be fixed by the Government.’”
In the above proposition it will be noticed that the lands to be “set apart” were for the Kansas and other Indians; and while in the first the language is that “ a portion of the lands hitherto owned and occupied by yon must be set apart for the friendly tribes in Kansas and elsewhere, on such terms as may be agreed upon by the parties and approved by the Government,” in the other the language is, “a part of the Indian country to be set apart and purchased for the use of such Indians.” So that in either case the lands “to be set apart” were to be purchased for the use of such Indians; and whatever doubt may have existed as to who was to pay therefor, as well as what lands were to be thus set apart, was removed when the treaty of April 28, 1866 (14 Stat. L., p. 769), was entered into. Hence to get a correct understanding of the parties we must look to that treaty.
By articles 30, 31, 37 of the treaty last named it is provided that the Choctaw and Chickasaw nations will receive, even before a survey of the lands has been made, “civilized Indians from the tribes known by the general name of the Kansas Indians, being to the north of the Indian Territory, not exceeding 10,000 in number, into their respective districts east of the ninety-eighth degree oftoest longitude,” with “the same rights as the Choctaws and Chickasaws,” including the right to select land the same as they — i. e., one-quarter section for each person in severalty, in consideration of such sum, not exceeding $1 per acre, as the legislatures of the respective nations may fix, to be paid by the United States out of the funds of such Indians as may remove into said nations.
Those provisions are in accord with the fifth proposition, as contended for by the defendants, and in harmony with the elucidation given thereto by the Commissioner of Indian Affairs at the time as aforesaid. Hence the lands to be so set apart and purchased were designated in article 30 as lands “east of the ninety-eighth degree of west longitude,” as the claimants had not “hitherto owned and occupied” lands west of that line, and besides the lands so set apart to them east *156 of tbe ninety-eighth degree of west longitude were equally “Indian country” with those west thereof.
The seventh proposition, to exclude white persons from residing in the Territory, “ unless formally incorporated with some tribe,” is embodied in article 43, which clearly shows that the prohibition is against white persons residing within the Choctaw and Chickasaw nations which are east of the ninety-eighth degree, west longitude. But as it is averred in paragraph 13 of the petition that all seven of the propositions, except the fifth, are embodied in the treaty of 1866, nothing further need be said with reference to them.
By article 9 of the treaty of 1855, as before stated, the Choctaws and Chickasaws had by lease to the United States parted with their interest in the lands west of the ninety-eighth degree of west longitude, except as stated in the proviso thereto— i. e., “the territory so leased shall remain open to settlement by the Choctaws and Chickasaws as heretofore.”
But even this right, as well as any other right or title to lands so leased, they were informed by the commissioners, as hereinbefore stated, they had forfeited by reason of their treaties with the Confederacy and their participation in the rebellion, and upon this theory, whether right or wrong, the treaty of 1866 was entered upon and finally executed.
So that by article 5, treaty 1866, “a general amnesty of all past offenses against the laws of the United States” was declared, while by article 10, it is provided that “the United States reaffirms all obligations arising out of treaty stipulations or acts of legislation with regard to the Choctaw and Chickasaw nations, entered into prior to the late rebellion, and in force at that time, not inconsistent herewith.”
By the same article the portion of annuities which had been withheld by reason of their participation in the late rebellion was renewed, to begin July 1, 1866.
Subsequent sections provided for a survey at the expense of the Government and division of their lands into severalty; the establishment of a land office, giving to each the right to select 160 acres and provide for the settlement of disputes in respect of such selections, thus showing that the purpose of the Government in relation to these Indians was to limit their right of absolute control, even though prior to the rebellion they held the lands in fee simple subject to occupancy.
*157 Hence tbe language in article 10 in respect of the reaffirmance by the Government of all claims arising out of treaty stipulations or acts of legislation, “entered into prior-to the late rebellion and in force at that time,” is limited by the words, “not inconsistent herewith.”
The “rights, privileges, and immunities” theretofore possessed by the claimants, as nations and as individuals, under former treaties and acts of Congress were, by article 45, treaty 1866, declared to be in full force only “ so far as they were consistent with the provisions” of that treaty. And by article 51, it was provided “that all treaties and parts of treaties inconsistent herewith be, and the same are hereby, declared null and void.” Therefore the rights of the claimants as they existed prior to the late civil Avar were modified and fixed by the treaty of 1866; and by that treaty,' which is clear and harmonious, their rights must be determined.
Has a treaty with an Indian tribe or nation the sanctity of an act of Congress, or is it simply an ordinary contract as between individuals ?
The Constitution of the Hnited States, article 6, section 2, provides—
“This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made( under the authority of the United States shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding.”
No distinction is there made between a treaty with a foreign nation and an Indian tribe, and I am aware of none having been made in adjudged cases. On the contrary, in the case of Fellows v. Blaolcsmith (19 How., 366, 372), in speaking of the objection therein raised to the validity of the treaty with the Tonawanda Band of Indians because the band was not represented by their chiefs and headmen in the negotiations and execution of the treaty, the court said: “But the answer to this is, that the treaty after executed and ratified by the proper authorities of the Government becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can go behind an act of Congress (1 Or., 103; 6 Pet., 735; 10 How., 442 ; 2 Pet., 307, 309, 314; 3 Story Const. Law, p. 695).” And such *158 has been the holding of this court. (Leighton Case, 29 C. Cls. R., 288, 822.)
Up to the time of our revolution, Great Britain recognized the Indians in this country “ as nations capable of maintaining' the relations of peace and war; of governing themselves, under her protection; and she made treaties with them the obligations of which she acknowledged.” (Worcester v. The State of Georgia, 6 Pet., 515, 548.)
That policy, inherited from Great Britain, was continued by the United States from the time of the first treaty made with the Delawares, September, 1778 (7 Stat. L., 13) until March 3, .1871, now Revised Statutes, section 2079, when for the first time the Congress declared that thereafter a different policy should prevail.
In respect of the right of suffrage under the Fourteenth Amendment to the Constitution, the Indians have been regarded as foreigners and not entitled to vote unless naturalized, and such has been the action of the political departments of the Government as well as the holding of the courts. (Lile v. Wilkins, 112 U. S., 94-103.)
The Congress, by the Indian depredation act, March 3,1891, (26 Stat. L., 851), recognize the Indians “as capable of maintaining the relations of peace and war” by making the question of the amity of the tribe, band, or nation to which the depredating Indians belong a jurisdictional fact.
The Congress regard treaties made with the Indian, tribes as of equal solemnity with those made with foreign nations, for by Revised Statutes, section 1066, they exclude from the jurisdiction of this court claims against the Government “growing out of or dependent on any treaty stipulation entered into with foreign nations or with the Indian tribes.”
In construing that section of the statute in the case of Great Western Ins. Go. v. United, States (112 U. S. R., 193,197), affirming the judgment of this court (19 C. Cls. R., 206) in dismissing the petition for want of jurisdiction, the court, by Mr. Justice Miller, said: “This language is comprehensive and explicit. If the cause of action grows out of a treaty stipulation the court can not entertain it. If it is dependent on any such stipulation the same result follows.”
Thus the Indians have been recognized as a treaty-making power; and a treaty, therefore, with an Indian tribe is a law *159 of tbe land, and its provisions, when in controversy in tbe courts, is to be determined by tbe same rules of interpretation that apply in tbe construction of acts of Congress. True, by tbe act of March 3,1871, now Eevised Statutes, section 2079, before referred to, it is provided that “no Indian nation or tribe witbin tbe territory of tbe United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom tbeUnited States may contract by treaty.” * * *
But the same section as clearly sanctions all former treaties made therewith by declaring that “no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired.”
Inasmuch as the claim in suit grows out of and is dependent on a treaty stipulation entered into with the claimants in 1866, the court’s jurisdiction is limited by the special act referring the case to the court, and beyond that the court can not go.
If, therefore, the relief sought in this suit depends upon a modification or reformation of the treaty, the authority therefor must be found in the special act, and such authority should not be inferred, for the reason that, if the treaty itself is a law of the land, then it has equal sanctity with an act of Congress, at least in respect of the rules which should govern in its interpretation, and hence to take it out of the application of such rules, so as to modify or reform the treaty, the authority there- ' for should expressly appear. (JEjoparte Atocha, 17 Wall., 439.)
Keeping in view what has been said, let us first look at article 3 of the treaty of 1866 (14 Stat. L., 769), which, as to the cession of tbe land, is as follows:
“Art. 3. The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the ninety-eighth degree, west longitude, known as the leased district.” * * *
That language is clear and explicit, about which there can be no doubt, and I fail to find any other provision or article in the treaty in conflict therewith or in any way modifying or limiting the cession thus made, or even referring thereto, except in article 46, wherein it is stipulated that of the money to be paid “for the cession of the leased district and the admission of Kansas Indians,” certain sums were to be advanced to each nation, to be repaid out of any money due the Indians.
*160 Tbe consideration for tbe cession bas been fully paid to tbe Cboctaws, and there only remains $17;37o due to tbe Chicba-saws, dependent on their nation enacting tbe required legislation in behalf of their freedmen, which has not yet been done.
The claimants herein are in advance of their race in civilization, self-dependent and self-governing, and many of them are highly educated, and were when the treaty of 1866 was entered into. Therefore, conceding the rule contended for by their counsel, that “the language used in treaties with the Indians should never be construed to their prejudice” {Choctaw Nation v. United States, 119 U. S. B., 1.27), still it has no application in this case. Besides, the language used is free from doubt and ambiguity, and not, therefore, “ susceptible of a more extended meaning than their plain import as connected with the tenor of the treaty,” and hence needs no interpretation.
Nor is there any need to resort to departmental construction, for, as said by Mr. Justice Brown in the case of United States v. Tanner (147 U. S. B., 661, 663), “it is only in cases of doubt that the construction given to an act by the Department charged with the duty of enforcing it becomes material.”
Again, in the case of United States v. Graham (110 U. S. B., 219-221), it was said:
“ Such being the case, it matters not what the practice of the departments may have been or how long continued, for it can only be resorted to in aid of interpretation, and “ it is not allowable to interpret what has no need of interpretation.” If there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling in its effect. But with language clear aud precise and with its meaning evident, there is no room for construction, and consequently no need of anything to give it aid. The cases to this effect are numerous.” {Edwards* Lessee v. Darby, 12 Wheat., 206; United States v. Temple, supra; Sioift Co. v. United States, 105 U. S. B., 691; Buggies v. Illinois, 108 U. S. B., 526.)
Could language be more explicit?
Following the cession of the leased district and in the same article is a proviso to the effect that the United States will invest at interest, and hold in trust for the claimants, the consideration of $300,000, so expressed to be given for the cession (in the proportion of three-fourths to the Choctaws and one- *161 fourth to tbe Ghiekasaws), “until the legislatures of the Choctaw and Chickasaw nations, respectively, shall have made such laws, rules, and regulations as may be necessary to give all persons of African descent resident in said nations at the date of the treaty of Fort Smith, and their descendants heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage of citizens of said nations, except in the annuities, moneys, and public domain claimed by or belonging to said nations respectively^ and also to give to such persons who were residents as aforesaid, and their descendants, forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said lands after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided.” ■
That done, the money, as in said article provided, was to be paid to the claimants, and if not done within two years from the ratification of the treaty, “ then the said sum of $300,000 shall cease to be held in trust for the said Choctaw and Chickasaw nations and be held for the use and benefit of such of said persons of African descent as the United States shall remove from the Territory.”
Here is a provision for changing the oeste que trust, but whether the money was paid in the .one way or the other no restriction, limitation, or qualification is thereby placed on the cessson made and none can be inferred. Whether the same was to be paid to the claimants for the cession, as the language imports, or whether it was intended as a fund to provide for their former slaves, seems to me immaterial, as the purpose and intention of the parties to the treaty, in respect of the cession, is clear from the language used, and nothing-said before, at the time, or subsequent thereto can change or add to the meaning anything different from what the language imports any more than an act of the Congress can be so changed.
Nor can the court, in the absence of doubt, look to the language of contemporaneous treaties made with other tribes similarly situated, in respect of their alliance with the Confederacy, even though the terms of such treaties be more advantageous, as the court can not inquire into the motives that influenced the'treaty-making power any more than it can the *162 motives that influenced Members of Congress in tbe enactment of laws. Tbe Cboctaws and Cbicbasaws may bave been and perhaps were tbe most active and influential leaders among tbe civilized Indians to form an alliance offensive and defensive with tbe Confederacy, and while “a general amnesty of all past offenses against tbe laws of tbe United States ” was declared by tbe treaty of 1866, their rights in and to tbe lands in question were modified and fixed by tbe same treaty. Whether it was wise for tbe treaty-making power so to do is not for tbe court to determine.
Tbe material language of tbe special act of Congress of March 2,1895 (28 Stat. L., 876, 898), referring tbe claim to tbe court is:
££ That as tbe Choctaw and Chickasaw nations claim to bave some right, title, and interest in and to tbe lands ceded by tbe foregoing agreement, which claim is controverted by the United States, jurisdiction be, and is hereby, conferred upon the Court of Claims to hear and determine the said claim of the Choctaws and Chickasaws and to render judgment thereon, it being the intention of this act to allow said Court of Claims jurisdiction, so that the rights, legal and equitable, of the United States and the Choctaw and Chickasaw nations, and tbe Wichita and affiliated bands of Indians in the premises shall be fully considered and determined, and to try and determine all questions that may arise on behalf of either party in the hearing of said claim. * * * And provided further, That nothing in this act shall be accepted or construed as a confession that tbe United States admit that tbe Choctaw and Chickasaw nations have any claim to or interest in said lands or any part thereof.”
That language falls far short of tbe language used in tbe special act referring tbe claim of tbe Old Settlers (Western Oberokees) to this court. (25 Stat. L., 694.) In that ease, reported (148 U. S. R., 427), tbe language of the act is ££that the claim be referred to tbe Court of Claims for adjudication; and jurisdiction is hereby conferred on said court to try said claim and determine what sum or sums of money, if any, are justly due from the United States to said Indians, arising from or growing out of treaty stipulations or acts of Congress relating thereto, * * * it being the intention of this act to allow the said Court of Claims unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of said Indians, may be fully considered and determined, and to try and determine all *163 questions tbat may arise in sueb cause on behalf of either party thereto and to render final judgment thereon.”
The claimants in that case had acquired, by treaty of 1828 and 1833, lands in the Indian Territory, and the United States thereafter, by treaty of 1835, conveyed the same lands to the Eastern Cherokees, which caused the Western Cherokees to protest against the invasion of their rights, and thereafter they entered into the treaty of 1846, ceding all their right, title, and interest, in and to the lands in dispute; but they claimed that the lands so ceded were procured for a grossly inadequate consideration through fraud and duress.
In their suit in that case they ask, among other things, a decree relieving them from the treaty of 1846 and requiring the United States to compensate them for the value of the lands obtained from the United States notwithstanding the treaty.
Although the provisions of the act, as was said by this court (27 C. Cls. R., 1, 35), “are as broad as language can make them,” the statute exceeding “in the measure of its liberality any which was ever enacted for the judicial redress of citizens of the United States,” still the court held that it was not thereby authorized to go behind the treaty of 1846 and declare it to have been procured by fraud or duress.
That holding was referred to in the case on appeal (148 U. S. R., 427, 466), and several authorities were cited, among which were those of Fletcher v. Feolc (6 Cranch, 87,130) and Ex parte MeOardle (7 Wall., 506, 514), in support of the proposition that the motives which influenced members of the legislative branch of the Government in the enactment of laws are not within the scope of judicial cognizance.
If not, then it follows that the court can not inquire into the motives or acts which may have influenced the commissioners, who were acting for the President on behalf of the United States, in negotiating the treaty they did.
I think the above reference with the authorities cited significant, even though the court held that the proposition “that a court may be clothed with power to annul a treaty on the ground of fraud or duress in its execution” did not arise in the case before them.
The court in substance held that the contention of the Western Cherokees as to their ownership of the lands by virtue *164 of the treaties of 1828 and 1833 was pat at rest by the treaty of 1846, that while a treaty might be modified or abrogated by an act of Congress, the “power to make and unmake is essentially political and not judicial.”
In that same connection the court further said: “The presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its own action or the action of the Government to judicial decision, authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference.”
Under the act in that case the court was to have “unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of the said Indians, may be fully considered and determined.” But this, the court says: “Did not mean that either party was entitled to have or receive by virtue of the act anything more than each was entitled to under existing stipulations, or to bring supposed moral obligations into play for the disposal of the case.” That, “ if conflict existed between treaty provisions, or between any of them and subsequent acts of Congress, such provisions might necessarily give way and be held invalid; but the language used did not involve a confusion of the respective powers of the departments of the Government, nor furnish a basis for an external attack upon the validity of an executive or legislative action.”
If, under the action of the special act in that case, the court, as was held by this court, and sanctioned by the Supreme Court, had no power to annul a treaty on the ground of fraud or duress in its execution, or submit the good faith of the Government to judicial decision, certainly this court, under the act of our jurisdiction, less broad, has no power to correct a mistake not apparent on the face of the treaty, or to change or alter the apparent meaning of the language therein by resorting to extraneous facts. Nor can the act be held as conferring on the court extra-judicial power, since it is provided that either party may appeal to the Supreme Court, whose jurisdiction as defined by the Constitution is strictly judicial. (Gordon v. The United States, 2 Wall., 561; Taney, Ch. J., 117 U. S. B., 697, Appx.; In re Sanborn, 148 U. S. B., 222; Western Cherokee Indians’ Case, 27 C. Cls. B., 1,36.)
*165 The special act of our jurisdiction provides, “ that as the Choctaw and Chickasaw nations claim to have some right, title, and interest in and to the land ceded by the foregoing agreement, which claim is controverted by the United States, jurisdiction is .hereby conferred upon the Court of Claims to hear and determine,” and furthermore, it is provided, “that nothing in this act shall be accepted or construed as a confession that the United States admit that the Choctaw and Chickasaw nations have any claim to or interest in said lands or any part thereof.” The agreement referred to is the one made by the United States with the Wichita and affiliated bands of Indians codefendants herein, who are also contesting the claimants’ rights.
No reference is made in the act to the treaty of 1866 or to any other treaty, nor is it stated therein^ as was done in the Western Cherokee Case (supra), that the claim referred to the court was one growing out of or dependent on treaty stipulations.
It is therefore questionable whether the language of the special act is sufficiently comprehensive to remove the prohibition contained "in Revised Statutes, section 1066. But considering the act as conferring jurisdiction, the naked question for the court to determine is, whether or not the claimants have, as claimed, “ any right, title, and interest in and to the lands ceded” by that agreement.
They claim they have, and base their contention on the theory that notwithstanding they ceded the lands to the United States, absolute in terms, by the treaty of 1866, the same was intended by the parties thereto as a cession in trust for the use of Indians only; and that when the Government ceased to use the land for that exclusive purpose, the same reverted to the claimants.
Therefore the claim they assert under the act, though not disclosed therein, grows out of and is dependent on treaty stipulations.
To establish such a trust necessarily involves going behind the treaty of 1866 for the purpose of considering the facts and circumstances which led up to it, as no such conclusion can be reached from the language of the treaty itself. In case of doubt it is permissible for the court to consider the history of the times, but that is not this case. It is not a question of construction, for, as before said, the language of the cession is *166 free from doubt and ambiguity and therefore needs no interpretation.
The claimants are seeking an interpretation of the treaty from external facts which question the good faith and acts of the treaty-making power. That, I contend, the Congress have not committed to official scrutiny or action. Besides, the construction they contend for would amount to a reformation of the treaty, and that can only be done by applying the rule in equity as between individuals to ordinary contracts in the conveyance of lands, i. e., that a deed conveying a fee may nevertheless be declared a conveyance in trust.
Tested by the rules of law applicable to the case, the claimants have no “right, title, and interest” in and to the lands in controversy, for the reason that by the treaty of 1866 they made, in language importing but one meaning, an absolute cession thereof to the Government; and their rights being fixed by that law, equity will not intervene to relieve them from the consequences of their own act.
We can not presume that Congress intended by the act to confer on the court a jurisdiction broader or different from that expressed therein, and in the absence of conflict between the act and the treaty the latter must stand without amendment or alteration.
In the case of The Amiable Isabella (6 Wheat., 1, 71) the court, by Mr. Justice Story, says:
“ In the first place, this court does not possess any treaty-making power. That power belongs, by the Constitution, to another department of the Government, and to alter, amend, or add to any treaty by inserting any clause, whether small or great, important or trivial, would be on our part an assumption of power and not an exercise of judicial functions. It would be to make and not to construe a treaty. Neither can this court supply a casus omissus in a treaty any more than in a law. W°e are to find out the intention of the parties by just rules of interpretation applied to the subject-matter, and having found that, our duty is to follow it as far as it goes, and to stop where that stops, whatever may be the imperfections or difficulties which it leaves behind.”
Could language be more explicit1? Is it within the power of the court under the act of our.jurisdiction to “alter, amend, or add to” the treaty by inserting therein words, however “important or trivial,” that would change the meaning and purpose of the cession? And, too, by accepting as evidence *167 tberefor admissions made before and after tbe execution and ratification of tbe treaty by tbe agents and officers of tbe Government against its interest %
Waters Case (4 0.01s. E., 390,391). Whiteside et al. v. United States (93 IT. S. It., 247).
To do so would be “ an assumption of power and not an exercise of judicial functions.”
If tbe treaty referred to were an act of Congress, would there be any controversy about the position stated?
Nor is tbe language of tbe special act enlarged by reason of tbe provision concerning tbe admissibility of evidence. It is provided therein that tbe “ court shall receive and consideras evidence in tbe suit everything which shall be deemed by said court necessary to aid it in determining tbe questions presented and tending to shed light on tbe claim, rights, and equities of tbe parties litigant.” That language is limited by tbe words “which shall be deemed by said court necessary to aid it in determining tbe questions presented,” etc. Of course tbe court, in tbe absence of any specified class of evidence in the act, must be bound by tbe ordinary rules of evidence, so that tbe general provision can not be construed to enlarge tbe scope of evidence nor to confer on tbe court extra judicial power. (Moore v. United States, 91 IT. S. E., 270.)
Therefore, for tbe reasons stated, I conclude that tbe Congress have not, by tbe special act, conferred upon this court jurisdiction to reform, alter, amend, add to, or go behind tbe treaty of 1866, or to change tbe meaning of tbe language evident on its face.
It may be that tbe claimants were wronged by tbe cession of tbe land under tbe treaty of 1866, but, if so, their remedy is with tbe political departments of tbe Government, and not with the judiciary, at least not until the Congress by definite and unmistakable language shall authorize tbe court to enter that field.
True, by tbe appropriation act of March 3,1891, section 15 (26 Stat. L., 989,1025), tbe Congress, in making appropriations to pay the Choctaws and Chickasaws for land similarly occupied by tbe Cheyenne and Arapahoe Indians within tbe district of lands so ceded by tbe claimants to tbe United States, did declare that tbe lands so occupied by tbe Cheyenne and Arapahoe Indians bad been ceded in trust by article 3 of tbe treaty *168 between the United States and said Choctaw and Chickasaw nations.” But thereafter, and before the passage of the act of our jurisdiction, by joint resolution, January 18,1893 (27 Stat. L., 753), to correct an error in the amount so appropriated, before payment, Congress added the proviso thereto as follows:
“Provided, however, That neither the passage of the original act of appropriation to pay the Choctaw and Chickasaw tribes of Indians for their interest in the lands of the Cheyenne and Arapahoe Reservation, dated March third, eighteen hundred and ninety-one, nor of this resolution, shall be held in anyway to commit the Government to the payment of any further sum to the Choctaw and Chickasaw Indians for any alleged interest in the remainder of the land situated in what is commonly known and called the Ceased district.’” (Joint Res. of Jan. 18,1893,27 Stats., 753.)
So that, whatever effect the appropriation act may have had by way of legislative construction of the treaty of 1866, was taken away by the joint resolution in respect of any further payment to the claimants for the remainder of the lands, and is not therefore a construction obligatory on the court or even persuasive; and such was manifestly the purpose of Congress by the proviso in the joint resolution, otherwise they would doubtless have adhered to and followed the precedent established by their own action and made an appropriation of a sum adequate, in their judgment, to compensate the claimants for the lands in dispute, instead of referring the claim to this court by an act in which they expressly say that nothing therein “ shall be accepted or construed as a confession that the United States admit that the Choctaw and Chickasaw nations have any claim to or interest in said lands or any part thereof.”
That language, in connection with the language in the proviso quoted above, makes it clear that what Congress intended was that this court should determine the rights of the claimants in and to the lands in dispute,’untrammeled by their declaration that the cession under the treaty of 1866 was a trust, and I have so considered the case, and reached the conclusion that the claimants’ petition should be dismissed.
It follows that the agreement entered into between the United States and the 'Wichita and affiliated bands of Indians set forth in the act March 2,1895 (28 Stat. L., 895,897), ratifying said agreement, should be carried out as therein provided, aided by said act.